Gary MARTIN and Michael L. Gleason, Appellants,

v.

Carl WHITE, Superintendent, Steve Long, Dr. Lee Roy Black, and Lew Kollias, Appellees.

No. 83–2712.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1984.

Decided Aug. 29, 1984.

Rehearing Denied Sept. 21, 1984.

Wion, Burke & Boll by Mason W. Klippel, Clayton, Mo., for appellants.

John Ashcroft, Atty. Gen., Rosalynn Van Hefst, Asst. Atty. Gen., Jefferson City, Mo., for appellees.

Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

ROSS, Circuit Judge.

In this case we deal with a subject matter which has become a national disgrace in some of our nation's prisons. We speak, of course, of the inability or unwillingness of some prison administrators to take the necessary steps to protect their prisoners from sexual and physical assaults by other inmates.

Gary Martin and Michael Gleason, inmates of the Missouri Training Center for Men in Moberly, Missouri, were sexually threatened and assaulted by fellow inmates in 1981. They brought this action under 42 U.S.C. § 1983 against Carl White, Superintendent of the Missouri Training Center,[1] seeking injunctive and monetary relief. They assert that the failure of defendant White to take reasonable steps to protect

---

1. Defendants Lew Kollias, an Assistant Attorney General of the State of Missouri, and Steve Long, an employee of the Missouri State Department of Corrections and Human Resources, were dismissed prior to trial on a motion for summary judgment. Plaintiffs fail to assert a basis for reversal as to these defendants, and none appears to exist. Accordingly, the judgment as to these defendants is affirmed. *See* FED.R.APP.P. 28(a)(4). Defendant Dr. Lee Roy Black, Director of the Missouri State Department of Corrections and Human Resources, was dismissed on a motion for a directed verdict. Black is responsible for the general management of the entire Missouri penal system. MO. REV.STAT. § 217.025 (1982). He was appointed Director on September 28, 1981, and began work on October 26, 1981. The assaults on the plaintiffs occurred prior to this time. Plaintiffs fail to assert a basis for reversal as to Black. Since none appears to exist, the directed verdict is affirmed as to defendant Black.

them from attacks by other inmates violated their eighth amendment right to be free from cruel and unusual punishment.

The case was tried before a jury. At the close of plaintiffs' case, the magistrate [2] granted defendant's motion for a directed verdict. Plaintiffs claim the magistrate erred. We agree.

## I. FACTS

The evidence shows that Martin was sexually threatened on at least three separate occasions in 1981: in April in the shower, on September 27 in his cell, and on October 7 in the dining room. Martin escaped actual forced intercourse on each occasion. However, in an effort to protect himself from the homosexual attacks, he obtained a knife. He was caught with this knife and given a three year sentence for carrying a concealed weapon.

According to plaintiffs' evidence Gleason was alone in his locked cell on the night of September 27, 1981, when he heard an inmate scratching on his lock with a paperclip. Within a second, the lock was picked and the door was open.

Four inmates rushed into his cell and, threatening him with a knife and iron bar, forced him into inmate Mark McCabe's cell. Gleason was placed face down onto a bed, spread-eagled, and sodomized by McCabe.

The Missouri Training Center is a medium security institution designed for a maximum occupancy of 1,034 inmates. However, in September of 1981, the institution housed 1,227 inmates.

Defendant White, as Superintendent of the Missouri Training Center, is responsible for the day-to-day operation of the facility. MO.REV.STAT. § 217.170 (1982). Plaintiffs argue that White failed to operate the Missouri Training Center in such a manner as to reasonably protect them from sexual assaults. They break this failure into four categories.

First, plaintiffs point to White's failure to establish adequate patrol procedures. The defendants stipulated that guards only infrequently patrol the hallways, especially at night. In fact, neither plaintiff saw any sign of guards on patrol during their assaults.

The design of the Missouri Training Center is such that the guards cannot see or hear much inmate activity unless they are on patrol. The guards are stationed in a central rotunda area from which four wings, each approximately fifty yards long, branch out. There are four floors to each wing. A solid, relatively soundproof metal door with a glass window separates the guards in the rotunda from the inmates in the wings. This door is kept locked. From the rotunda area, the guards cannot see into the inmate's cells.

Second, plaintiffs point to White's failure to establish an adequate classification system. More specifically, they direct attention to the fact that McCabe's record showed that he had assaulted other inmates at another Missouri prison in April and June of 1981. Yet, Missouri Training Center officials assigned McCabe to the general population amongst inmates with nonviolent histories.

Third, plaintiffs point to White's failure to establish an adequate mechanism to assure that the inmates' cells are safe from attack. In 1981, White relied entirely on the inmates themselves to discover whether their locks were defective. In the fall of 1982 all of the locks were examined for defects, for the first time, during an accreditation examination.

Finally, plaintiffs point to White's failure to refer previous inmate assaults to the local prosecutor. They assert, and White admitted, that a practice of not reporting such assaults would fail to provide deterrence for future assaults.

Indeed, inmate assaults are commonplace at the Missouri Training Center. Between 1979 and April of 1983, there were 59 actu-

**2.** David D. Noce, United States Magistrate for the Eastern District of Missouri.

al reported assaults[3] and over 300 claimed assaults. These figures are, in all likelihood, somewhat low, as many assaults may go unreported. The fact that there were over 1,837 appearances by inmates seeking protective custody between 1979 and April of 1983 supports this inference. Further, defendants stipulated that plaintiffs could produce a number of inmates who would testify that assaults, including those of a sexual nature, occur on a "fairly regular basis."

Yet, less than ten of the assault cases from the above period were referred by White to the local prosecutor and prosecuted. McCabe's assault on Gleason was not one of these.

## II. STANDARD FOR DIRECTED VERDICT

We have often repeated the following standard:

It is fundamental that a motion for directed verdict is properly denied where the evidence presented allows reasonable men in a fair exercise of their judgment to draw different conclusions. A directed verdict is in order only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party. * * * In making this determination, the evidence, together with all reasonable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party.

*Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir.1970), *cert. denied,* 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971) (emphasis in original) (citations omitted). *See, e.g., Hinkle v. Christensen,* 733 F.2d 74, 76–77 (8th Cir.1984); *Dace v. ACF Industries, Inc.,* 722 F.2d 374, 375 (1983), *supplemented,* 728 F.2d 976 (8th Cir.1984); *Tribble v. Westinghouse Electric Corp.,* 669 F.2d 1193, 1195 (8th Cir.1982), *cert. denied,* 460 U.S. 1080, 103 S.Ct. 1767, 76 L.Ed.2d 342 (1983).

In applying the above standard, the court must:

(1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Dace v. ACF Industries, Inc., supra,* 722 F.2d at 375.

Further, as a general rule, only the evidence favoring the nonmoving party should be considered. *Id.* at 376–77.

## III. DISCUSSION

### A. General

The Missouri penal system presents this court with yet another look at the atrocities and inhumane conditions of prison life in America. In particular, we are focused on the failure of prisons to protect inmates from assaults.

The pervasive nature of prison assaults is well documented. Justice Blackmun summarized the findings of researchers and governmental agencies in this area as follows:

A youthful inmate can expect to be subjected to homosexual gang rape his first night in jail, or, it has been said, even in the van on the way to jail. Weaker inmates become the property of stronger prisoners or gangs, who sell the sexual services of the victim. Prison officials either are disinterested in stopping abuse of prisoners by other prisoners or are incapable of doing so, given the limited resources society allocates to the prison system. Prison officials often are merely indifferent to serious health and safety needs of prisoners as well.

Even more appalling is the fact that guards frequently participate in the brutalization of inmates. The classic exam-

---

**3.** Thirteen were reported in 1979, seven in 1980, seventeen in 1981, fifteen in 1982, and seven up to April of 1983.

ple is the beating or other punishment in retaliation for prisoner complaints or court actions.

*United States v. Bailey,* 444 U.S. 394, 421–22, 100 S.Ct. 624, 640–41, 62 L.Ed.2d 575 (1980) (Blackmun, J., dissenting) (footnotes omitted).

The facts presented in this case and in numerous other cases dealing with the failure of prisons to protect inmates are disturbingly consistent with the above findings.

Statistics on violence in America's prisons also shed light on the extent of the problem. The Supreme Court recently conducted a partial survey of statistics on violent crime in our nation's prisons, revealing that:

> During 1981 and the first half of 1982, there were over 120 prisoners murdered by fellow inmates in state and federal prisons. A number of prison personnel were murdered by prisoners during this period. Over 29 riots or similar disturbances were reported in these facilities for the same time frame. And there were over 125 suicides in these institutions. See Prison Violence 7 Corrections Compendium (Mar. 1983). Additionally, informal statistics from the U.S. Bureau of Prisons show that in the federal system during 1983, there were 11 inmate homicides, 359 inmate assaults on other inmates, 227 inmate assaults on prison staff, and 10 suicides. There were in the same system in 1981 and 1982 over 750 inmate assaults on other inmates and over 570 inmate assaults on prison personnel.

*Hudson v. Palmer,* —— U.S. ——, ——, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984).

These statistics take on additional meaning when it is recognized that they reflect merely the tip of the iceberg, as many violent assaults never find their way into the record books.[4]

We cannot assume that legislators and prison officials are insensitive to the requirements of the Constitution or to legitimate penological objectives. *Rhodes v. Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981). However, the research findings, cases, and statistics certainly reflect an indifference by officials, and society as a whole, to the right of prisoners to be free from assaults.

■ Generally, courts must defer to the legislative and executive authorities in the administration of prisons. *See, e.g., Block v. Rutherford,* —— U.S. ——, ——, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984); *Hewitt v. Helms,* 459 U.S. 460, 467 (1983); *Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979). However, the failure of the authorities to adequately deal with the problem of prison assaults counsels us to not be hesitant to find a constitutional violation, if one exists, and to provide an adequate remedy for the violation.[5] In sum, we "have learned from repeated investigation and bitter experience that judicial intervention is *indispensable* if constitutional dictates—not to mention considerations of basic humanity—are to be observed in the prisons." *Rhodes v. Chapman, supra,* 452 U.S. at 354, 101 S.Ct. at 2403 (emphasis in original).

**B. Cruel and Unusual Punishment**

■ Prisons need not be country clubs, or even comfortable. *Rhodes v. Chapman, supra,* 452 U.S. at 349, 101 S.Ct. at 2400. But, in order to comply with the eighth

**4.** *See, e.g., United States v. Bailey,* 444 U.S. 394, 426 n. 6, 100 S.Ct. 624, 642 n. 6, 62 L.Ed.2d 575 (1980) (Blackmun, J., dissenting) (if a kid who is raped tells the guards, "his life isn't worth a nickel"); *Doe v. District of Columbia,* 701 F.2d 948, 966 (D.C.Cir.1983) (Edwards, J., separate statement); *State v. Green,* 470 S.W.2d 565, 569 (Mo.1971) (dissenting opinion), *cert. denied,* 405 U.S. 1073, 92 S.Ct. 1491, 31 L.Ed.2d 806 (1972) (life of inmate of Missouri Training Center for Men who reports a rape not worth "a plugged nickel").

**5.** We note that punitive damages may be awarded in an action under section 1983 against prison officials showing a reckless disregard for the right of prisoners to be free from assaults by fellow inmates. *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).

amendment prohibition against cruel and unusual punishment, prison punishment must comport with " 'the evolving standards of decency that mark the progress of a maturing society.' " *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (*quoting Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)). Moreover, such punishment must not " 'involve the unnecessary and wanton infliction of pain,' " *Rhodes v. Chapman, supra*, 452 U.S. at 346, 101 S.Ct. at 2399 (*quoting Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion)), which includes those punishments that are " 'totally without penological justification.' " *Id.* (*quoting Gregg v. Georgia, supra*, 428 U.S. at 183, 96 S.Ct. at 2929).

Subjecting prisoners to violent attacks or sexual assaults, or constant fear of such violence, shocks modern sensibilities and serves no legitimate penological purpose. *See United States v. Bailey, supra*, 444 U.S. at 423, 100 S.Ct. at 641 (Blackmun, J., dissenting). We reject as below any level of decency the theory that sexual or other assaults are a legitimate part of a prisoner's punishment. Accordingly, we have concluded that prison officials may be liable where they are "deliberately indifferent to [a prisoner's] constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates." *Branchcomb v. Brewer*, 669 F.2d 1297, 1298, *appeal after remand*, 683 F.2d 251 (8th Cir.1982). *See also Walsh v. Brewer*, 733 F.2d 473, 476 (7th Cir.1984); *Stewart v. Love*, 696 F.2d 43, 44 (6th Cir.1982); *Wade v. Haynes*, 663 F.2d 778, 781 (8th Cir.1981), *aff'd sub nom. Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Little v. Walker*, 552 F.2d 193, 197–98 (7th Cir.1977), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978).

We can find no evidence in the record suggesting that White actually intended to deprive the plaintiffs of their right to be free from attacks. However, plaintiffs presented sufficient evidence regarding the question of whether White acted with reckless disregard of their right to be free from inmate attacks to get beyond a directed verdict at close of their case in chief.

Reckless disregard of plaintiffs' right to be free from attacks by other inmates may be shown by the existence of " 'a pervasive risk of harm to inmates from other prisoners' " and a failure by prison officials to reasonably respond to that risk. *Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.), *cert. denied*, 449 U.S. 849 (1980) (*quoting Woodhous v. United States*, 487 F.2d 889, 890 (4th Cir.1973)). *See also Walsh v. Brewer, supra*, 733 F.2d at 476; *Murphy v. United States*, 653 F.2d 637, 644–45 (D.C.Cir.1980). The Fourth Circuit clarified the definition of a "pervasive risk" in *Withers* stating:

> A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution. * * * It is enough that violence and sexual assaults occur * * * with sufficient frequency that * * * prisoners * * * are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures. * * *
>
> It is not necessary to show that all prisoners suffer a pervasive risk of harm. It is enough that an identifiable group of prisoners do, if the complainant is a member of that group.

*Withers v. Levine, supra*, 615 F.2d at 161.

The frequency of attacks at the Missouri Training Center is sufficiently high that a jury might reasonably find a pervasive risk of harm to the prisoners. Defendants' stipulation that plaintiffs could produce witnesses who would testify that assaults occur on a "fairly regular basis," combined with evidence of the number of reported assaults and requests for protective custo-

dy at the Missouri Training Center, would justify a jury in finding that assaults are sufficiently pervasive to reasonably apprise prison officials of the need for protective measures.[6]

■ Although we recognize that some violence in prisons may be unavoidable due to the character of the prisoners, *see, e.g., Hudson v. Palmer, supra,* 104 S.Ct. at 3200; *Doe v. District of Columbia,* 701 F.2d 948, 951 (D.C.Cir.1983) (MacKinnon, J., separate statement); *Penn v. Oliver,* 351 F.Supp. 1292, 1294 (E.D.Va.1972), the studies and statistics on inmate assaults reflect that the overall prison norm grossly exceeds the rate of assaults which can be characterized as "unavoidable."[7] Accordingly, plaintiffs need not establish that the rate of assaults at the Missouri Training Center exceeds that at similar institutions in order to establish pervasiveness. *See Doe v. District of Columbia, supra,* 701 F.2d at 964–65 (Edwards, J., separate statement). *But see Murphy v. United States, supra,* 653 F.2d at 642.

■ Once it is established that a "pervasive risk of harm" existed, it must be determined whether the officials reasonably responded to that risk. Defendant White's failure to develop administrative policies which would provide adequate protection to the plaintiffs would clearly justify a jury in finding that he failed to reasonably respond to the risks of inmate assaults.

First, White stationed the guards where they could provide little protection to the inmates. Second, his failure to develop a policy for discovering defective cell locks allowed violent inmates to freely enter other inmates' cells. Any segregation policy he developed was thereby rendered worthless. Finally, his policies fail to deter future rapes or assaults. His failure to report many of these assaults to the prosecutor is in itself relevant evidence of his reckless disregard of the rights of his other prisoners. When a felonious assault occurs, he is under a duty to report it to the prosecutor. He has no right to decide which felonious assaults should be reported and which should not. A violation of criminal law is as much a crime in prison as it is outside prison walls.[8] Combined, White's policies not only failed to reasonably protect inmates, but may have actually encouraged inmates to attack others with impunity.

■ The magistrate granted the directed verdict partially on the basis that liability in a section 1983 action cannot be grounded upon a *respondeat superior* theory. *See Branchcomb v. Brewer, supra,* 683 F.2d at 254. Here, however, White's liability is founded upon his own conduct—a failure to develop adequate protection policies. *See, e.g., Redmond v. Baxley,* 475 F.Supp. 1111, 1115–16 (E.D.Mich. 1979). The jury could have found that the

6. We note that new entrants to the prison system may be "an identifiable group of prisoners" more prone to a risk of harm and in need of greater protection due to the fact that they may be less prepared to avoid or defend against inmate assaults. *See Van Horn v. Lukhard,* 392 F.Supp. 384, 387 (E.D.Va.1975). In this case, the assaults on Martin first began in the orientation program, while Gleason was raped only two weeks after he arrived at the Missouri Training Center.

Also, the dissenting opinion in *State v. Green,* 470 S.W.2d 565 (Mo.1971), *cert. denied,* 405 U.S. 1073, 92 S.Ct. 1491, 31 L.Ed.2d 806 (1972), reveals that the conditions at the Missouri Training Center have existed for some time. Homosexual acts and sexual assaults were "matters of common knowledge among the inmates" and the cell door locks "could easily be picked with any sharp object." *Id.* at 569. Clearly, officials

of the Missouri Training Center have had the deficiencies of the institution pointed out to them, and cannot reasonably protest that they were not aware of the existence of the problem.

7. This is especially true in light of the extensive control prison officials may exercise over prisoners. *See, e.g., Hudson v. Palmer,* — U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (prison officials may search cells; fourth amendment not applicable); *Block v. Rutherford,* — U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (random shakedown searches of pretrial detainees' cells may be conducted; detainees have no right to watch).

8. In fact, Missouri law provides that "an offer [by an inmate] to commit violence * * * to another inmate" is a felony. MO.REV.STAT. § 217.385 (1982).

assaults on the plaintiffs resulted from this failure, not from the failure of White's subordinates to comply with his policies.

Accordingly, the judgment of the trial court is reversed as to defendant White, affirmed as to the other defendants, and remanded to the district court for action consistent with this opinion.