**Connie Lee McGHEE,**
**Plaintiff–Appellee,**

v.

**Dale FOLTZ, Warden, State Prison of Southern Michigan, Individually and in his Official Capacity, Defendant–Appellant.**

**No. 87–1612.**

United States Court of Appeals,
Sixth Circuit.

Argued May 3, 1988.

Decided July 28, 1988.

Brian MacKenzie, Asst. Atty. Gen., Lansing, Mich., Susan Harris (argued), for defendant-appellant.

Patricia Streeter, Detroit, Mich., Timothy P. Murphy (argued), Michael L. Donaldson, Livonia, Mich., for plaintiff-appellee.

Before LIVELY, MERRITT and BOGGS, Circuit Judges.

LIVELY, Circuit Judge.

This is an appeal by the warden of a Michigan medium security prison from a judgment for damages in favor of an inmate who was assaulted while standing in the gallery outside his cell. Following a bench trial the district court found that there was a pervasive risk of harm in the prison to which the warden failed to respond by providing adequate staffing in the plaintiff's cell block. This failure was found to constitute deliberate indifference to the plaintiff's constitutional right to be free of cruel and unusual punishment as guaranteed by the Eighth Amendment. We reverse.

## I.

The plaintiff, who had been an inmate at the State Prison of Southern Michigan (SPSM) for several years when the assault occrred, described himself as being about five feet nine inches tall and weighing about 150 pounds. He was stabbed by an unidentified man whom he described as being about six feet tall and weighing 160–170 pounds. The plaintiff had seen the other man in the area, but was not concerned about him until the other man stabbed him. He said the assailant had some sort of cloth or a ski mask covering his face, and that he could not identify him. At the time of the assault there was no guard in the third gallery of the block where the plaintiff's cell was located. The plaintiff went downstairs to the "base" of the cell block where he found a guard who arranged for medical treatment.

The stabbing took place after the plaintiff had returned from breakfast at about 8:45 a.m. on September 27, 1984. The plaintiff had entered his cell and then had gone back out to the passageway when he was attacked. The evidence established that the greatest risk of violence occurs during periods of "population movement," when inmates are out of their cells and moving in large groups to and from the dining hall or the yard.

The plaintiff had never been warned that he was a target for violence, and had never been attacked in prison before, although he had been chased by another prisoner in 1979. He had never advised a guard that he might be in danger and had never asked for protection. In fact, he turned down one offer of protection after he recovered from the stabbing. However, the plaintiff testified that a prisoner who talks to a guard or asks for protection is labelled a "snitch" and is more likely to be attacked. Nevertheless, procedures were in place for protecting threatened inmates.

The defendant testified that the prison had received some influx of gang members and maximum security inmates in 1984. However, he had no control over the types of prisoners assigned to the facility. He also acknowledged that there was some increase in violent assaults, but denied that violence was pervasive.

The defendant testified that normal staffing requires four officers and one sergeant to be assigned at all times to the cell block where the plaintiff was lodged. This is the minimum number for security during times of movement in the cell block, although one of the officers always accompanies the prisoners when they leave the block. Foltz testified that having one of the officers accompany the group when they leave the block does not leave an insufficient number to provide security. In fact, when prisoners are moving out of the galleries the best location for staff is "on base" as they come down the stairwell. In addition to the officers in the block, there is a gun turret manned by an officer armed with a rifle. This turret looks down into the block and other turrets with armed guards overlook the yard and monitor movements of the inmates after they leave the cell blocks. The warden testified that he had never been informed that the plaintiff's cell block was understaffed.

A former officer in the plaintiff's cell block, James Finch, testified that he was on duty when the plaintiff was stabbed. In somewhat confusing testimony Finch stated that normal staffing on September 27 was three officers and one sergeant in the block where the stabbing occurred. He testified further that one officer had gone to the dining hall to help supervise residents of the block at breakfast, leaving two officers and a sergeant actually in the block when the stabbing occurred. Sergeant Butler, who was also in the cell block at the time of the stabbing, testified that there were three officers present at the time. Finch testified that the plaintiff had never complained about the risk of violence in the cell block and there had been no reports of threats against the plaintiff prior to the incident.

## II.

The district court issued findings of fact and conclusions of law. There was a great deal of questioning by the plaintiff's attorney about the condition of the locking devices in the cell block and about the presence of illegal drugs in the prison. However, the district court made specific findings that neither defective locking mechanisms nor implementation of the prison's anti-drug policy was the proximate cause of the assault. The court found that on the date of the plaintiff's injury it was the policy of the prison to have a sergeant and four officers patrolling the four galleries of the plaintiff's cell block at all times. The court found that although at the time of the assault the inmates were moving to the yard, there were only three officers and a sergeant in the block because the fourth officer was out of the block escorting prisoners to the dining hall for breakfast. Concluding that this officer should have been patrolling the third gallery where the stabbing occurred, the district court found that the warden had failed to uphold the

security staffing policies of the prison at the time of the assault and that this was a proximate cause of the attack.

Following its findings of fact the district court discussed the law applicable to Eighth Amendment claims against prison authorities and then listed "Conclusions of Law and Fact." Among these undifferentiated "Conclusions" were the following:

4. Defendant did not intentionally deprive the plaintiff of his constitutional right to be free from cruel and unusual punishment.

5. Violence occurred at the SPSM with sufficient frequency to place plaintiff in reasonable fear of his safety.

6. A pervasive risk of harm existed at the SPSM at the time of plaintiff's assault.

7. Plaintiff was subject to cruel and unusual punishment due to the fact defendant was deliberately indifferent to the plaintiff's constitutional rights by acting with reckless disregard of plaintiff's right to be free from violent attack by fellow inmates.

8. Defendant did not reasonably respond to the pervasive risk of harm which existed within the Central Complex of the SPSM at the time of plaintiff's injury.

9. Defendant's failure to maintain proper staffing during periods of population movement was the proximate cause of plaintiff's injury.

10. But for the unlawful acts of defendant, plaintiff would not have been subject to cruel and unusual punishment.

### III.

#### A.

■ We find little support in the record for the district court's finding that the defendant failed to uphold the security and staffing policies of the prison by permitting the practice of having one officer accompany the prisoners to meals. The court specifically found that four officers plus a sergeant were assigned to the cell block at the time of the stabbing and found where each was located when the assault occurred.

38. At the time of the plaintiff's assault, one officer was assigned to patrol the third and fourth galleries; one officer and the sergeant were assigned to base level; one officer was assigned to patrol the first and second galleries of 7 Block; and the final officer was out of the block escorting prisoners to the dining hall for breakfast.

This was the normal staffing, according to Warden Foltz. It was the temporary absence of the officer who was in the dining hall that formed the basis of the district court's determination that there had been a departure from prison policy. Yet, Foltz testified unequivocally that while four officers always work the block during times of movement, one of the four officers accompanies the inmates as they leave the block, and that this does not leave an insufficient number for security on the galleries. It is clear that the district court did not rely on the testimony of Officer Finch who said that "normal staffing" on September 27, 1984, was three officers and a sergeant. The district court must have based its conclusion of departure from policy on the absence of the officer in the dining hall, because in its findings the court accounted for all four officers plus a sergeant. The district court found that the inmate population was moving to the yard when the stabbing occurred, although the plaintiff testified that he was preparing to take a shower. At any rate, it was a time of movement, and the district court appears to have based its finding of a failure to maintain proper staffing on Warden Foltz's testimony that this was the time of greatest danger. This finding overlooks the warden's testimony that having an officer accompany the inmates when they leave the cell block does not result in insufficient security and that the best place for staff during movement is at the base, not in the galleries.

■ We are aware of the limitations surrounding our review of a district court's findings of fact in a non-jury case. *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We

have noted that there was confusion about staffing, and we treat this as a case where there are two permissible views of the evidence. In such a case the factfinder's choice cannot be held clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed.2d 150 (1949). However, this does not conclude our inquiry. We must determine whether this possible departure from normal staffing can be the basis under the facts of this case for a determination that the defendant violated the plaintiff's Eighth Amendment rights.

### B.

■ We disagree with the conclusion of law/fact that a pervasive risk of harm existed at the prison at the time of the stabbing. The inmate population of SPSM in 1983 and 1984 was about 5200. The district court made no findings as to the number of serious assaults suffered by inmates during those years. The plaintiff relied on statistics introduced by the defendant which demonstrated that there were two homicides and 129 assaults at SPSM during 1983. Of the 129 assaults, 32 resulted in serious injury and 47 involved the use of weapons. In 1984 the total number of assaults increased to 416, but only 49 resulted in serious injury and 93 involved the use of weapons.

The defendant also filed as an exhibit to his motion for judgment on the pleadings or for summary judgment a report by the Bureau of Justice Statistics that included a "Crime Risk Index." This report, released in May 1985, showed that about three percent of Americans each year are victims of violent crime. Prisons are by definition places where violent people are housed involuntarily. All prisons experience incidents of crime that exceed the levels of the outside. *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). While the rate of total assaults at SPSM rose from approximately two and one-half percent in 1983 to about eight percent in 1984, those resulting in serious injury remained at a low level. There was no evidence that the incidence of serious

assaults by inmates on other inmates at SPSM exceeded the rate experienced at prisons of this kind generally. Nor was there evidence that the plaintiff was a member of any identifiable group of inmates that had been targeted for assault.

The cases dealing with claims based on a pervasive risk of harm require more than the plaintiff demonstrated here. In *Murphy v. United States*, 653 F.2d 637 (D.C. Cir.1981), the court found that a pervasive risk had not been established where there was a six percent assault rate in the plaintiff's prison dormitory and there was no evidence that this rate was "outside the range of violence normally associated with this type of penal institution, or that any subset of prisoners suffered from an unusual risk of attack." *Id.* at 642 (footnotes omitted). While "much less than proof of a reign of violence and terror in the particular institution" is required to demonstrate a pervasive risk of harm, a single incident or several isolated incidents are not sufficient. *Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.1980), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980).

The plaintiff testified that he had never been threatened or attacked in prison, had no known enemies and had no warning before the attack that he might be in danger from other inmates. He relied solely on the total number of assaults in a large prison rather than showing any conditions that would have led the defendant to believe he, or other inmates in his cell block, were in danger of attack. Although he testified that prisoners of slight build, in the 120–pound range, are particularly vulnerable, he described himself as five feet, nine inches tall and weighing 150 pounds. We conclude that the proof did not establish the existence of a pervasive risk of harm to inmates of SPSM in September 1984.

### IV.

### A.

■ In determining whether prison officials have violated the Eighth Amendment rights of an inmate by failing to protect

him from assault by another inmate this court has applied a standard of "gross negligence or deliberate indifference on the part of officials to [the plaintiff's] risk of injury." *Stewart v. Love*, 696 F.2d 43, 44 (6th Cir.1982). In *Roberts v. City of Troy*, 773 F.2d 720, 724 (6th Cir.1985), the court pointed out that this standard applies even when a plaintiff establishes the existence of a pervasive risk of harm; negligence in failing to respond to that risk is not enough. Neither this court nor the Supreme Court has approved a negligence standard, and in view of more recent pronouncements of the Supreme Court, even the reference in *Stewart v. Love* to "gross negligence" is no longer valid.

In *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 671, 88 L.Ed.2d 677 (1986), the Supreme Court made it clear that lack of due care by prison officials is not sufficient to support a § 1983 action claiming a due process violation. The suit in *Davidson* was brought by an inmate against the prison administrator and other officials, seeking damages for injuries suffered when the plaintiff was stabbed by another inmate. The plaintiff had claimed both Eighth and Fourteenth Amendment violations, but the district court had dismissed the Eighth Amendment claim because the plaintiff failed to establish "deliberate or callous indifference" to the plaintiff's needs and because the stabbing was a single attack. *Id.* at 346, 106 S.Ct. at 669. In *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), the Supreme Court announced the standard to be applied in deciding Eighth Amendment claims by prisoners against prison officials. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 319, 106 S.Ct. at 1084. The Court recognized that "[a]n expressed intent to inflict unnecessary pain is not required," and that the "deliberate indifference" standard set forth in *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), applies. *Id.* The Court repeated its earlier statement in *Ingraham v. Wright*, 430 U.S. 651, 670, 97

S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977), quoting *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290: "After incarceration, only the 'unnecessary and wanton infliction of pain' ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley*, 475 U.S. at 319, 106 S.Ct. at 1084. In *Whitley*, although the plaintiff was injured by a prison guard, the Supreme Court did not limit its statement of the standard to cases of that kind. It applies equally where the claim is that prison officials failed to protect an inmate from injury by another inmate.

## B.

After examining the entire record we are convinced that the evidence in this case fell far short of establishing deliberate indifference or wantonness on the part of Warden Foltz. He had no notice or knowledge of any danger to the plaintiff or of any particular problems in the plaintiff's cell block. There was no evidence of threats against the plaintiff or any group of which he was a part. The fact that there had been a recent increase in the number of assaults within the entire prison, the great majority of which did not result in serious injury, is not sufficient to support the plaintiff's Eighth Amendment claim. The fact that there may have been one officer less than normal staffing in the plaintiff's cell block at the time of the stabbing—a fact of which Foltz was not made aware—is not evidence of any dereliction on his part that rises to the level of cruel and unusual punishment. The defendant had the responsibility for operating a large prison and providing security for 5200 prisoners as well as the prison staff. A holding on the basis of this record of wantonness or deliberate indifference on the defendant's part is unrealistic and not supported by controlling law.

The judgment of the district court is reversed, and the case is remanded with directions to dismiss the complaint. No costs are taxed on appeal; each party will pay his own costs.