**Michael Lavern RIBBLE, Plaintiff,**

v.

**Jim LUCKY, Defendant.**

**No. 90–CV–70986–DT.**

United States District Court, E.D. Michigan, S.D.

March 31, 1993.

Daniel Manville, Detroit, MI, for plaintiff.

George Stevenson, Lansing, MI, for defendant.

AMENDED OPINION AND ORDER GRANTING DEFENDANT'S RULE 50 MOTION FOR A JUDGMENT AS A MATTER OF LAW

ROSEN, District Judge.

### I. *INTRODUCTION*

This Section 1983 prisoner civil rights action came before the Court for trial by jury March 16–19, 1993. The gist of Plaintiff Ribble's claim is that Defendant Lucky violated his Eighth Amendment right to be free of cruel and unusual punishment by requiring him to honor a law library "call-out" on May 8, 1989. At that time, Ribble was a prisoner at the State Prison of Southern Michigan in Jackson and Defendant Jim Lucky was the assistant prison librarian. Ribble was stabbed by another prisoner when he went on "call-out" to the law library on that date.

Defendant Lucky moved, pursuant to Fed. R.Civ.Pro. 50, for Judgment as a Matter of Law (f/k/a "directed verdict"), contending that Plaintiff failed to establish a sufficient evidentiary/legal basis for his Eighth Amendment claim. At the close of Plaintiff's proofs late in the day on March 19, 1993, the Court, in a bench ruling, granted Defendant's motion. However, as the Court indicated on March 19th, it wants the record to accurately reflect the reasons for its ruling, and therefore, advised counsel for the parties that it would issue a written Opinion and Order. This Opinion and Order sets forth the Court's ruling on this matter.

### II. *FACTS ESTABLISHED BY PLAINTIFF'S PROOFS*

Taken in a light most favorable to Plaintiff Ribble, the evidence presented by Plaintiff establishes the following facts.

1. Prior to the date of the incident in question, Plaintiff Michael Ribble, in the past, had been subject to death threats from other prisoners.

2. Ribble knew about those prior death threats, and in fact, he had fairly recently returned to the general prison population after being in protective custody as a result of death threats.

3. Prior to May 8, 1989, beginning approximately on April 30, 1989, Ribble began to receive "library call-outs" which he did not request.

4. After another "false" call-out on May 7th, Ribble requested in writing that all law library call-outs be discontinued. That written request—Plaintiff's Exhibit 14—stated "Please discontinue all call outs for Law Library as of 5–7–89." Both Ribble and Lucky

testified that this note was written at the request of Defendant Lucky.

5. Ribble claims that he also told Defendant Lucky that the library call-outs he had been receiving were false. (Lucky denies that Ribble ever told him this, claiming that all Ribble told him was that he did not want to be in the library.)

6. It is uncontroverted that Ribble never told Lucky that he knew of any death threats against him or even that he was afraid of death threats, and there is no evidence whatsoever that Lucky knew of any threats against Ribble.[1]

7. Lucky testified that, when he received Ribble's note requesting discontinuance of law library call-outs, he gave the note to his prison library clerk, inmate Campbell, with instructions to see that Ribble's call-outs were discontinued. Campbell complied with Lucky's instructions. In fact, the word "Done" was written by inmate Campbell on Ribble's May 7 note. [See Plaintiff's Ex. 14 and Campbell's testimony.]

8. Library call-outs for May 8, 1989, however, had already been prepared on May 4th [see Plaintiff's Ex. 9], before Ribble's note requesting discontinuance of the call-outs was received by Lucky.

9. Somehow, Ribble's name did not get removed from the May 8, 1989 library call-out list. Therefore, Ribble was "called out" to come to the library on May 8th.

10. When he was called out to come to the library on that date, Ribble was assaulted and stabbed by another prisoner, inmate Pringle–Bey.

### III. BASIS OF PLAINTIFF'S EIGHTH AMENDMENT CLAIM AGAINST DEFENDANT LUCKY

Despite the fact that there is no evidence of record whatsoever that Lucky had any actual knowledge of threats to Ribble, Plaintiff claims that Defendant Lucky should be held liable for his injuries because Lucky "should know" that inmate-against-inmate assaults sometimes occur and that life in prison, in general, is violent. Plaintiff's theory is

that by virtue of these general propositions, the jury could infer that Lucky should have known about the death threats against Ribble.

### IV. APPLICABLE LEGAL STANDARDS

It is well-settled that, "[i]n the context of prison cases involving assault by other inmates, mere negligence on the part of prison officials is not sufficient to give rise to culpability under the eight amendment." *Stewart v. Love* 696 F.2d 43, 44 (6th Cir. 1982), citing *United States v. Twomey*, 479 F.2d 701, 721 (7th Cir.1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974) and *Williams v. Field*, 416 F.2d 483 (9th Cir.1969), cert. denied, 397 U.S. 1016, 90 S.Ct. 1252, 25 L.Ed.2d 431 (1970). Indeed, even "gross negligence" is insufficient. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *McGhee v. Foltz*, 852 F.2d 876, 881 (6th Cir.1988). Rather, in order to support a § 1983 action claiming violation of the Eighth Amendment, the standard is whether the evidence establishes that the conduct of the defendant prison official amounted to "deliberate indifference" to a risk of injury to the plaintiff. *See*, *Whitley v. Albers, supra*, 475 U.S. at 319, 106 S.Ct. at 1084; *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *McGhee v. Foltz, supra; Roland v. Johnson*, 856 F.2d 764, 769 (6th Cir.1988); *Walker v. Norris*, 917 F.2d 1449, 1454 (6th Cir.1990); *Marsh v. Arn*, 937 F.2d 1056, 1060 (6th Cir. 1991).

In defining "deliberate indifference", the Supreme Court has explained that while an "express intent to inflict unnecessary pain is not required, ... [i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments clause." *Whitley v. Albers, supra*, 475 U.S. at 319, 106 S.Ct. at 1084. In *Walker v. Norris, supra*, the Sixth Circuit elaborated on the *Whitley* deliberate indifference standard, explaining:

> A defendant acts with deliberate indifference if he causes unnecessary and wanton infliction of pain on [the plaintiff] by delib-

---

1. Indeed, Plaintiff admitted that he himself did not know of any actual threat at the time, al- though he had heard vague rumors shortly after he returned from protective custody.

erately disregarding a serious threat to [the plaintiff's] safety after actually becoming aware of that threat. A mere inadvertent or negligent failure to adequately protect [the plaintiff] does not constitute deliberate indifference.

917 F.2d at 1454.

That the plaintiff establish that the defendant had "actual knowledge" of a "specific" threat of harm to the plaintiff was emphasized by the Sixth Circuit in *Marsh v. Arn,* 937 F.2d 1056 (6th Cir.1991). In that case, the district court had granted the motion for judgment notwithstanding the verdict filed by four prison officials. The Sixth Circuit affirmed the grant of JNOV explaining:

> Viewing the evidence in the light most favorable to Marsh, it establishes only that [defendant] Amis knew of [inmate] Leonard's previous two fights among inmates and that she knew that Marsh wanted to change rooms. This evidence is insufficient to raise a jury question as to whether Amis had actual knowledge of a genuine, or has [sic] one court put it, a "specific" risk of harm to Marsh.

937 F.2d at 1061.[2]

The *Marsh* court acknowledged that the requirement that the defendant be found to have had "actual" knowledge may, in appropriate circumstances be by-passed, but explained that by-passing the requirement was only appropriate when "the presence of danger [is] so great that knowledge can be inferred." *Id.*

In addressing "inferred deliberate indifference", the Sixth Circuit explained in *Marsh* that the defendant's actual knowledge of a specific, genuine risk of harm to the plaintiff may only be by-passed where evidence of record is presented to show that the plaintiff was a "member of an identifiable group of prisoners for whom risk of assault was a

serious problem [at the particular institution]" or where the record evidence establishes "a pervasive risk of harm ... prove[n] by an excessive number of assaults." *Id.* at 1062, *citing Walsh v. Mellas,* 837 F.2d 789 (7th Cir.1988), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988), and *Martin v. White,* 742 F.2d 469 (8th Cir.1984). In *Marsh,* however, no such evidence was presented at trial and, therefore, the court summarily rejected the plaintiff's inference arguments in that case.

■ An analysis of the cases in which deliberate indifference was inferred, however, reveals that, even in "pervasive risk of harm" and "identifiable group at risk" cases, some evidence of "knowledge" on the part of the particular defendant of the risk of harm must be presented.

For example, in *Walsh v. Mellas, supra*—one of the cases cited by the *Marsh* court—Walsh, the plaintiff-prisoner, had assisted prison officials at Menard (Illinois) repulse an attack on a prison office by inmate members of two street gangs—the Disciples and the Vice Lords. Walsh was subsequently transferred to Statesville prison in Joliet, but he feared that gang member prisoners at Statesville would retaliate against him for his role in the Menard prison office incident. He therefore asked to be placed in protective custody. The prison officials complied with his request. 837 F.2d at 792.

Walsh still feared for his life and asked to be transferred to a different prison. States-ville officials denied this request. *Id.* Walsh then asked to be placed in 24–hour lockup, which was a separate cell block used to house inmates who violated a prison rule or were awaiting a disciplinary committee hearing. (Some inmates apparently believed that 24–hour lockup was more secure than protective custody, so they would commit a technical

---

**2.** The *Marsh* court addressed the evidence presented with respect to each of the defendants individually. As with Defendant Amis, the court found that the district court also properly granted JNOV in favor of the three other prison officials because the evidence presented by the plaintiff failed to create a jury submissible issue of fact as to whether any of the defendants had actual knowledge of a genuine, specific risk of harm to the plaintiff. *See* 937 F.2d at 1063,

1064, 1065. As with defendant Amis, the court held that Plaintiff's failure to inform the defendants of inmate Leonard's threats against her rendered her Eighth Amendment deliberate indifference claims legally deficient. With respect to the one defendant whose motion for JNOV had been denied by the district court—Defendant Furrow—the appellate court held that Furrow was entitled to qualified immunity and therefore, was also entitled to JNOV. *Id.* at 1069.

rule violation to gain admittance to 24–hour lockup.) *Id.* In order to be assigned to 24–hour lockup, Walsh improperly refused his cell assignment and was charged with a disciplinary violation.

Statesville officials regularly assigned two men to each cell in 24–hour lockup. Before double-celling inmates guilty of rules violations, officials were required by regulation to determine the prisoners' compatibility by checking their files. However, that regulation did not apply to prisoners awaiting disciplinary hearings. In those cases the cell keeper did nothing more than assign cellmates based upon the inmates' size and his experiences with them. *Id.*

When Walsh was assigned to 24–hour lockup, he was assigned to an empty cell. The next day however, the cell keeper assigned another inmate, Frank Lee, to double with Walsh. Lee was a Vice Lords member. When Lee was brought to Walsh's cell, Walsh immediately asked the prison guard not to put Lee in the cell with him. (The guard testified that he could not recall Walsh making such a request.) The next day, prison officials found Lee standing over Walsh with a wire around Walsh's neck. Walsh had also been stabbed.

The evidence presented to the district court during a bench trial revealed that the two defendants specifically knew that (1) gang activity was a serious problem at Statesville and (2) the risk of assault by gang members upon inmates targeted by gangs was real and significant. *Id.* at 795. The evidence further showed that plaintiff was, and was known by prison officials, to be such a targeted inmate. *Id.*

The specific evidence presented by the plaintiff was the following. Walsh testified that he had received numerous threats from gang members beginning almost immediately after he was transferred to Statesville, and that he repeatedly conveyed the information to prison officials. 837 F.2d at 798. Walsh went so far as to write a letter to his counselor about the gang threats and that letter was placed in his master file. *Id.* The evidence further showed that inmate Lee was known to prison officials as a gang leader; a report identifying him as such was in his master file.

*Id.* Lee also had a tattoo "VL" on his chest, which was noted in his file. *Id.*

Plaintiff also presented as evidence at trial a study done by the John Howard Association, a prison watchdog group, which statistically documented the number of reported instances of inmate-on-inmate gang-related attacks at Statesville during the time that Walsh was incarcerated there. *Id.*

Based upon the foregoing evidence, the court entered a monetary judgment in favor of the plaintiff and against the two defendants. The Seventh Circuit affirmed, explaining:

> The findings recited above emphasize that critical to the court's decision was its finding that: (1) officers Mellas and Martin had *knowledge* that gang activity was a serious problem at Statesville at the time; (2) the risk of assault by gang members upon inmates targeted by gangs was real and significant; (3) the plaintiff was known to be such a targeted inmate and therefore a member of an identifiable group of prisoners *for whom* risk of assault was a serious problem; and (4) that the two defendants devised and operated a security system which ignored that risk.... In the face of the known risks of gang-related attacks at Statesville, the defendants' failure to establish a procedure for the screening of the file of an inmate to be assigned to the "investigative status" area of the prison to ensure some level of compatibility with his cellmate supports the trial judge's conclusion that the defendants exhibited the kind of "deliberate indifference" to a prisoner's right to security that in this court's view amounts to "punishment" under the [Eighth Amendment].

837 F.2d at 796 (emphasis in original; punctuation omitted.)

Knowledge of the prison officials was also an important factor in the Fourth Circuit's decision in *Martin v. White, supra,* another case cited by the Sixth Circuit in *Marsh.*

In *Martin,* the plaintiff had been and was known by prison officials to have been attacked by other inmates at least four previous times. He proceeded to trial on a "per-

vasive risk of harm" theory. The court defined "pervasive risk of harm" as follows:

A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution. It is enough that violence and sexual assaults occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures.

It is not necessary to show that all prisoners suffer a pervasive risk of harm. It is enough that an identifiable group of prisoners do, if the complainant is a member of that group.

742 F.2d at 474.

*Martin*, like *Walsh*—and unlike this case—involved defendants who were prison policy makers. In that case, the appellate court reversed the trial court's grant of a directed verdict, focusing on the evidence of the defendant prison official/policy makers' knowledge of the pervasiveness of violent attacks and sexual assaults that plaintiff presented at trial. The plaintiff presented evidence that he himself had been assaulted four previous times and that the prison officials had reports on each of those incidents. Further, Defendants stipulated at trial to admission of evidence establishing that the officials knew that assaults occurred at the Missouri Training Center on a "fairly regular basis". *Id.* As further proof, plaintiff presented documentary evidence of the number of reported assaults and requests for protective custody at the institution. *Id.*

Recently, the Sixth Circuit dealt with "inferred deliberate indifference" in *Hill v. Marshall*, 962 F.2d 1209, 1213–1214 (6th Cir. 1992). *Hill* was a case involving deprivation of medication. The plaintiff-prisoner had been diagnosed as having tuberculosis and was receiving medication for it while housed at the Hamilton County Jail (in Ohio) and while at the Columbus Correctional Facility. But when he was transferred to Southern Ohio Correctional Facility ("SOCF") he was deprived of his needed medication.

He testified that he was told that to get his medicine he had to stand in the pill line, which he did, but he still was not given his prescribed medicine. Repeated written requests to the deputy superintendent of treatment at SOCF and to the infirmary administrator did not remedy the situation.

The case was tried before a jury and the jury returned a verdict and monetary award of damages in favor of the plaintiff and against two defendants, including defendant Terry Morris, the deputy superintendent of treatment. Morris moved for JNOV, and his motion was denied. He subsequently appealed to the Sixth Circuit. The appellate court affirmed the trial court's denial of JNOV.

In reaching the conclusion that Morris' JNOV motion was properly denied, the appellate court examined the evidence presented at trial. The court noted the following:

[The] evidence tended to show that the facility's health care system was poorly run in general. A report was compiled and written by Shirley Pope, Senior Research Associate for the Correctional Institution Inspection Committee ("Committee"). The Committee was established by the Ohio legislature for the express purpose of making such reports. *Her research showed that many inmates complained about not receiving medicaments, such that SOCF had a pervasive pattern of failing to provide proper medication for inmates.* Furthermore, Morris himself testified that the pill line was closed sometimes when it should have been open, that prescriptions were not always filled or received by inmates, and that prescriptions were sometimes altered or destroyed by the head nurse without a doctors approval. ***Morris further testified that he knew of all of these circumstances and for months—during the very period in which Hill was allegedly not receiving his medication—he did little or nothing about it.***

962 F.2d at 1212 (emphasis added).

Morris attempted to argue on appeal that the evidence only showed that he had failed to respond to one complaint from Hill about not getting his medication, and that the jury

could not infer from his failure to respond to one complaint that he was deliberately indifferent to Hill's medical needs. *Id.* at 1213. The Sixth Circuit disagreed with Morris's characterization of the evidence and with his legal argument:

> We disagree with Morris's characterization of this issue. The jury's finding is not supported solely by the fact that Hill's kite went unanswered. *Also of great significance in this case is the fact that Hill was able to offer* **strong** *proof of a pervasive pattern of indifference to the inmates' medical needs generally.*

*Id.* at 1213–1214 (emphasis added).

*Walsh, Martin,* and, most importantly, our own Circuit's decision in *Hill,* taken collectively demonstrate that for a plaintiff's case to go to the jury on an "inferred deliberate indifference" theory, the plaintiff must present evidence that shows that the defendant had some knowledge of a risk of harm to the plaintiff, and to do away with the requirement that the defendant's knowledge be of a *specific* risk of harm to the plaintiff, the plaintiff must present "strong" evidence of a "pervasive" pattern of substantial risk to inmates' safety.[3]

■ In the instant case—unlike the plaintiff's case in *Hill, supra*—Plaintiff did not put on "strong" evidence that he was subject to a "pervasive risk of harm" at Jackson. His only evidence consisted of general assertions that inmate-against-inmate assaults do occur at Jackson, and that inmates have been known to sometimes write up library "call-outs" for other inmates. Essentially, Plain-

tiff argues that Lucky's knowledge of risk of harm to Ribble should be inferred simply because Lucky, merely by virtue of working in the prison, should have known that prison life, in general, is violent. This is a legally insufficient basis from which to infer deliberate indifference on the part of the Defendant.[4]

Since there was not sufficient evidence presented by Plaintiff Ribble from which deliberate indifference on the part of Defendant Lucky might be inferred, for his case to go to the jury, Plaintiff would have to have established that Defendant Lucky had "actual knowledge" of a specific risk of harm to Ribble. Plaintiff failed to meet this burden.

As indicated above, Plaintiff's written request that his library call-outs did not indicate that there were threats made against him by anyone. Rather, Plaintiff's note stated only "Please discontinue all call outs for Law Library as of 5–7–89." Further, it is uncontroverted that Ribble never told Lucky that he knew of any death threats against him or even that he was afraid of death threats, and there is no evidence whatsoever that Lucky knew of any threats against Ribble.

Moreover, the evidence does not establish that Defendant Lucky ignored Plaintiff's request that his library call-outs be discontinued. Quite the contrary, Lucky gave the note to his prison clerk, inmate Campbell, with instructions to see to it that Ribble's call-outs be discontinued, and the record

---

3. Moreover, the Court finds the "inferred deliberate indifference" doctrines applied in *Walsh, Martin* and *Hill* to be of questionable application in this case because all three of those cases involved constitutional challenges to prison policies, procedures and regulations, and all involved defendants who were directly responsible for establishing the challenged policies. Hence, there was in each case, a direct "nexus" between the defendants and the challenged policies, procedures and regulations. Here, our plaintiff has not lodged a constitutional challenge to a prison "policy"—such as a policy regarding segregating violent prisoners, a regulation governing the assignment of cellmates, or procedures for distributing medications—and our defendant was only an "assistant prison librarian", which is not a policy-making position.

4. Nor has Plaintiff presented sufficient evidence to establish that he was a member of an "identifiable group of prisoners for whom risk of assault was a serious problem." Unlike the plaintiff in *Walsh,* Ribble was not a "known target" for assault by a particular inmate or group of inmates, and he has not shown that he was a member of some other "identifiable group of prisoners" known frequently to be assaulted. (Although Plaintiff testified that he had had one homosexual experience while in prison, he has not presented evidence that he was a "known" homosexual. In fact, in his May 25, 1989 supplemental report of the stabbing incident to the State Police, Ribble denied being a homosexual. [See Defendant's Ex. 13.])

shows that Campbell complied with Lucky's directive.[5]

Viewing the evidence in a light most favorable to the Plaintiff, the Court finds that Plaintiff Ribble has failed to establish that Defendant Lucky had actual knowledge of specific death threats against him and has failed to present evidence from which deliberate indifference on Lucky's part might be inferred. For these reasons, the Court finds that Defendant is entitled to judgment in his favor as a matter of law.

## V. *CONCLUSION*

For all of the foregoing reasons,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant Lucky's Fed.R.Civ.Pro. 50 Motion for Judgment as a Matter of Law be, and hereby is, GRANTED. Accordingly,

Let Judgment be entered, in favor of the Defendant and against the Plaintiff, and Plaintiff's case be dismissed in its entirety with prejudice.

---

**5.** The Court notes that while Plaintiff has sued assistant librarian Lucky claiming that he is responsible for his injuries, Plaintiff reported in his May 25, 1989 report to the State Police that he personally believed that Campbell "set him up" to be assaulted. [See Defendant's Ex. 13.]