Arthur Donell GILLAND, Kenneth Myles, Donald Renee Starks, Henry Alexander Williams, Vincent Landers Brevard, Milton Smith, Troy Weston Deloach, Aaron D. Thomas, Terry Harding, Carlton Suggs and Robert Brockert, acting on their behalf and on behalf of others similarly situated, Plaintiffs,

v.

Jack OWENS, in his personal capacity and in his official capacity as Sheriff of Shelby County, Ed Totten, in his personal capacity and in his official capacity as Jailer of Shelby County, William N. Morris, Jr., in his official capacity as Shelby County Mayor and The Shelby County Board of Commissioners, Defendants.

Nos. 87–2191 GA, 87–2276 GA, 87–2273 GA, 87–2429 GA, 87–2341 GA, 87–2348 GA, 88–2924 GB and 88–2095 GA.

United States District Court, W.D. Tennessee, W.D.

Aug. 16, 1989.

Peter M. Brown, Brian L. Kuhn, Carroll C. Johnson, Memphis, Tenn., David Himmelreich, Kimbra Rowlette Spann and Debra K. Inglis, Nashville, Tenn., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO CONDITIONS ISSUES

GIBBONS, District Judge.

In this class action plaintiffs seek declaratory and injunctive relief on behalf of all persons who are or will be confined in the Shelby County Jail in Memphis, Tennessee.[1] Plaintiffs sue under 42 U.S.C. § 1983 and, challenging conditions at the Shelby County Jail, allege that defendants, acting under color of state law, have deprived them of various federal constitutional rights. Original defendants in the case are Jack Owens, Sheriff of Shelby County; Ed Totten, then chief jailer of Shelby County; William N. Morris, Jr., Shelby County Mayor, and the Shelby County Board of Commissioners. The original defendants filed a third-party claim against Ned McWherter, Governor of the State of Tennessee; Stephen Norris, then Commissioner of Correction for the State of Tennessee; and W.J. Michael Cody, then Attorney General for the State of Tennessee. The court determined that the issue of constitutionality of conditions at the jail would be bifurcated from all other issues in the case. Proof with respect to this phase of the case was heard by the court without a jury. In addition to the proof presented in the courtroom, the court made a visit to the jail on July 25, accompanied by counsel for the parties.[2] The court has considered all the evidence and applicable law and now makes the following findings of fact and conclusions of law.

---

1. The named plaintiffs also seek damages. The damage claims were bifurcated from the claims for declaratory and injunctive relief and are not presently before the court.

2. Although the parties were aware in advance of the possibility of such a visit, they were not advised that the visit would in fact occur or of its precise date and time until shortly before the visit.

## I. FINDINGS OF FACT

### A. The Factual Proof

This case is a broad-based attack on conditions in the Shelby County Jail, and proof was presented about many aspects of jail life. Although plaintiffs do not claim that each area is a separate constitutional violation, a review of most areas of proof is necessary for a proper legal and factual analysis.

1. *Crowding.* The Shelby County Jail was opened in 1981 with a design capacity of 1,195 inmates. Its principal intended purpose was the housing of pretrial detainees. Since 1986 the average daily population in the jail has exceeded its design capacity. In 1986 the average daily population was 1,272 inmates; in 1987 it was 1,566 inmates; in 1988 it was 1,574, with the average daily population for the last three months of the year exceeding 2,000 inmates; for the first six months of 1989 the average daily population was 2,268. In June 1989 the population exceeded 2,500 inmates for the first time.

Today the facility houses pretrial detainees and convicted felons and misdemeanants. The convicted felons include inmates sentenced to the Tennessee Department of Correction, who cannot be accepted by the state due to a court-imposed cap on the state prison population.[3] Currently pretrial detainees comprise approximately seventy-two percent of the jail population; state-sentenced prisoners are eighteen percent of the population. Although pretrial detainees as well as convicted inmates frequently remain in the jail for months or longer, seventy percent of persons booked into the jail are released within seventy-two hours.

The jail is a modern structure with six floors. The lower level includes intake areas and certain individual cell housing, including a maximum security area. Women are housed on the first floor. There are also family and attorney visitation areas in this part of the facility. On the second floor the medical care facilities are located, and inmates with medical and other special needs are housed. Jail trustees are also housed on the second floor in an area that was originally intended to be used as a hospital. The principal general population areas are on the third and fourth floors. The fifth floor includes the legal room and a large and small gymnasium. There is a large outdoor recreation area on the roof.

Most of the detention areas in the jail are divided into pods that consist of a certain number of cells which can be separately locked and a day room with television and benches. The day rooms vary in size, but each cell in the jail is fifty-four square feet. Each cell has a bunk consisting of a metal slab upon which a mattress can be placed and a combination toilet, drinking fountain and wash basin. Each pod has one or two showers, depending upon its size.

Although the pods vary in size, the most typical type of pod in the jail was intended to house twenty-three prisoners. A pod of this type consists of twenty-three cells, each with its own toilet. Such a pod has two showers and its day room is 1,008 square feet. Due to the crowding in the institution, these pods now house approximately sixty persons. Five triple-tiered bunks have been placed in the day rooms of these pods, with sleeping space for fifteen inmates. Two individuals generally sleep in each cell, one on the bed and the other on a mattress on the floor. On occasion three may sleep in a single cell. Theoretically, one or two cells are left unoccupied, so that the individuals who sleep in the day room will have access to a toilet. All cell doors are kept open to provide additional toilet access for those without a cell.

2. *Jail Staff and Control.* The staff for the facility numbers approximately 442. The number of staff has not increased for several years. Most staff members are correctional officers, called deputy jailers. Turnover among deputy jailers is high. In June 1989 the number of security staff present on the daytime shift averaged seventy-five. The security staff on a given

---

**3.** The state prison litigation is pending in the United States District Court for the Middle District of Tennessee before Judge Thomas Higgins.

floor for a shift typically consists of one supervisor, two deputy jailers in the control room and two to three deputy jailers for each side of the floor or a total of four to six patrolling the hallways and catwalks on each floor. Each side of a floor houses approximately 300 inmates.

The patrolling officers have responsibility for making random inspections of the hallway and catwalk areas every fifteen minutes. The presence of the triple bunks in the day rooms makes viewing the pod from the hallway more difficult. The catwalk windows, through which the officer is supposed to be able to look into the cells, are frequently covered with materials of various types by the inmates. Even when the window onto the catwalk is not covered, the opening between the cell and the day room is often covered by a towel or blanket, making the interior of the cell quite dark. Thus, it is difficult to see inside such a cell, even if the catwalk window is not covered.

Internally, each pod is controlled by an inmate known as the pod man, who may be the strongest or most senior inmate in the pod. Although this system is not officially recognized or condoned by jail administrators, jail administrators are well aware of it and utilize the system by dealing with the pod men as representatives of the entire pod on occasion. The pod man designates an inmate known as the phone man, who determines who gets telephone time. A phone is located within each pod, which is turned on by staff for a period of time each day. The phone man determines who gets to use the phone and for what period of time.

Eight counsellors are on the jail staff. Three of these, including the supervisor, are trained counsellors. The others were originally hired as clerks or deputy jailers, but are being used as counsellors due to crowding. Defendants emphasize that these counsellors do not perform psychological counseling for inmates. Essentially, the counsellors are gatekeepers to services in the institution. They make regular rounds in the pods. By means of a form submitted through a counsellor, an inmate may request medical attention, a pass to the legal room or assistance in contacting his family or an attorney. Counsellors generally process request forms on the day they are received.

3. *Inmate Activities.* There is little inmate activity at the jail. Apart from a few inmates who were working in the dining rooms or on the second floor, the only observed inmate activities on the day the court visited the jail were sleeping, talking and watching television. Virtually all inmates were locked in their pods.

For a period of some months prior to May 1989, neither gymnasium was used for recreation. The large gym was used to house inmates at this time. Apparently the minigym was used for protective custody at some time. After this court ordered the removal of inmates from the gym, these areas became available for recreational use. At the time of trial, however, they were once again unavailable due to construction activities at the jail. The outdoor recreation area has not been used at all for quite some time, due to lack of staff.

Jail records reflect very little use of the jail's recreational facilities. In June 1989 the jail summary report indicates 3,396 inmate trips to recreation during the month. Given these figures, it is apparent that most inmates participated in recreation no more than once during that month. Even when the jail was much less crowded, in early 1988, jail summary reports indicate that use of the recreational facilities was not extensive.

The jail has no educational or other programs. Alcohol and drug treatment and counseling are not available. There are a few religious activities operated through the chaplain's office. Jail reports indicate that the average monthly number of inmate trips to programs for the first six months of 1989 was 1,269. For the same period in 1988 the average monthly number of trips was 1,262.

Visiting hours for family and friends of inmates are from approximately 8:00 a.m. to 9:00 p.m. Inmates are taken to the visiting areas to see their visitors. There often are long lines of visitors waiting for a

visiting cubicle to become available. While the jail population has increased substantially in the last year, the number of visits from members of the public has increased only slightly. For example, from March to May 1988, when jail average daily population was 1,570, attorney/public visits totalled 20,607. For that same time period in 1989, when the population averaged 2,354, visits totalled 21,366. In other words, the number of visits rose four percent, while the population increased fifty percent.

4. *Medical Services.* Medical services are provided to inmates by the Regional Medical Center at Memphis (The MED) pursuant to a contract between Shelby County and The MED. MED employees staff a clinic on the second floor of the jail. The clinic includes examination rooms, a pharmacy, a room for minor surgical procedures and a kitchen from which meals for inmates with special needs are served. Claudette Laney, a registered nurse, is in charge of the medical staff at the jail. Most of the jail medical staff consists of retired military corpsmen, who are licensed EMTs or paramedics. One doctor is present at the jail clinic each day. An inmate's request for medical attention is initiated by filling out a form which a counsellor delivers to medical staff. There is no regular sick call, except for jail trustees. Generally, an inmate is seen the day after he makes his request for medical attention. In the event of an emergency, arrangements can be made for the inmate to be seen immediately. Inmates involved in fights are taken to the clinic soon after the altercation occurs.

When an inmate is seen in the clinic, he is examined by a medic. Pursuant to a written protocol, the medic determines whether he can treat the individual or whether the inmate needs to see a doctor or be taken to a hospital. If hospitalization is required, the inmate is taken to the MED.

Inmates who need regular medical attention or medications are housed together on the second floor of the jail facility. One medic is located in the intake area of the facility at all times and conducts a medical screening for each new inmate admitted to the jail. In this way any particular medical needs, such as the need for regular medication, are identified.

Recently, medical staff initiated a procedure of sending a medic to the third and fourth floors to see patients on those floors. A temporary office for the medic was established in the supervisor's office on the floor. This practice assisted in reducing the number of individuals who sought medical care, because an inmate was no longer removed from his floor to get medical attention. Thus, the incentive to seek unnecessary medical attention was eliminated by this procedure. The procedure has temporarily been discontinued, however, because of lack of personnel; when expected additions to the staff report for duty in the near future, it will be resumed.

Although proper procedures for providing medical care to inmates exist, on occasion inmates do not receive prompt medical attention. One inmate testified about a delay of weeks before he was treated for sinus problems and an ingrown toenail. Two inmates who were taken to the medical unit after fights, Charles Lee and Robert Brockert, testified that they did not receive prompt medical treatment for their injuries. Although Lee sustained facial fractures and was bleeding from his mouth and nose after being beaten by other inmates, he testified that there was a delay of some six to seven hours before he was taken to the hospital. Brockert was also beaten by other inmates. He testified that there was a delay of several hours before he saw a medic in the jail and that the medic then refused to treat him. Brockert had suffered several broken teeth as a result of the fight, and at the time of trial, some six weeks after the fight, he had not yet seen a dentist for this problem.

Jeremiah Triplett, who is 64 years old, was housed in the jail for over twenty-four hours after an arrest. Triplett is a diabetic. Triplett received initial medical screening in the intake area. When the jail did not have the type of insulin that he required, his daughter was allowed to bring

his insulin from home to him. Despite this early attention to Triplett's medical condition upon his entry into the jail, he soon encountered a problem in receiving needed medical care. Triplett's medical condition requires that he eat regularly. Despite jail officials' knowledge of his condition, he was unable to get a guard to respond to requests by Triplett and his son that he be fed or even given a glass of juice. The guard on duty was rude to Triplett and basically told him that he didn't care what his medical situation was. Triplett's condition was deteriorating when the shift changed. The supervisor on the new shift responded to his request, an action which Triplett credited with saving his life.

5. *Legal Facilities and Services.* The jail has its own legal room, which inmates may visit for a thirty-minute period. Trips to the legal room are obtained by submitting a request through a counsellor. Jail records indicate an average of 881 inmate trips to the legal room per month for the first six months of 1989.

The legal room itself is a small room containing a few incomplete sets of law books. The titles of books in the legal room are fully set forth in trial exhibit 23. Notably, there are only three volumes of the Tennessee Code Annotated, none of which would appear to have any relevance to a typical inmate's legal needs. The volume of the United States Code Annotated containing Title 28 §§ 2241–2253, which includes the statute under which state prisoners typically seek habeas corpus relief in federal court, is present, but does not have a pocket part. No other United States Code volumes are present. There are no current state or federal reporters or digests. There are no materials dealing specifically with topics that would be of interest to inmates, for example criminal or constitutional law, civil rights, criminal or civil procedure. Two forms are available in the legal room. One of these, devised by a jailhouse lawyer, is directed to the public defender and permits an inmate represented by the public defender's office to request that his attorney file certain motions on his behalf in his currently pending criminal case. The other form, supplied or devised by the clerk of this court, is a complaint form on which an inmate can submit an action under 42 U.S.C. § 1983.

Inmates are freely permitted to consult with their attorneys. Virtually all of the attorneys who visit the jail are of course either appointed or retained counsel with respect to the inmates' currently pending charges. Two inmates designated jailhouse lawyers, but who have no legal training, also provide legal services to the other inmates. The jailhouse lawyers are given extended privileges in the legal room. There is no other program under which lawyers or law students provide legal assistance of any sort to inmates.

6. *Sanitation, Hygiene and Supplies.* Considering the heavy use of the jail facility, it is reasonably clean. Inmates are expected to clean their living areas and are furnished cleaning supplies for this purpose. Consequently, the living areas vary in their degrees of cleanliness. Plumbing facilities receive heavy use, and problems with toilets and showers are common. Such problems are repaired, however, in a reasonably prompt manner.

Delivery of materials for personal comfort and hygiene is a greater problem. Charlie Mullins, assistant director of support services for the jail, conceded that mattress shortages occur and that on two occasions the jail has been completely out of mattresses for a period of days. Several inmates testified that they had waited days or weeks to obtain a mattress. Typically, the lack of a mattress occurred when the inmate was housed in lower level housing. The lower level housing is an area to which an inmate is taken after going through the intake process. It is supposed to be an area in which inmates are held for no more than seventy-two hours, but stays frequently exceed this length. Inmate testimony also indicated that toilet paper, sheets, blankets, and towels frequently are not provided in lower level housing. While jail officials disputed this point and asserted that such supplies were regularly provided on the lower level, the consistency of the inmates' testimony in terms of the location in which these items were not provided

convinces this court that inmates are deprived of these materials with some frequency on the lower level. In addition, inmates are not issued personal hygiene items such as toothbrushes and toothpaste while they are in the lower level. Also, they do not receive jail clothes until they are moved out of the lower level. Therefore, when an inmate is held in lower level for an extended period of time, he is unable to maintain good personal hygiene during this period.

7. *Discipline.* The jail's policies and procedures manual contains an adequate system for disciplining prisoners who violate jail rules. Crowding in the facility, however, makes the proper functioning of this system difficult. Cells are often unavailable to segregate those who commit disciplinary infractions. On the day of the court's jail visit, only two cells in the entire facility were being utilized to house prisoners who were being punished for disciplinary violations. There is some evidence suggesting that an individual who is disciplined may receive probation in circumstances where disciplinary segregation would seem more appropriate, or punishment may be deferred pending cell availability. There is also evidence that disciplinary charges have been dismissed for failure to conduct hearings within the required time period. The record does not permit a conclusion, however, about the frequency with which any of these situations occurs. Finally, there is evidence from a former deputy jailer that jailers often do not charge inmates with disciplinary violations because of a lack of space to punish inmates.[4] In fact, discovering certain types of disciplinary violations is difficult. The crowding in living areas and lack of sufficient staff makes it impossible to conduct regular searches of living areas for contraband. As noted previously, crowding and the unavailability of sufficient staff make observation during patrol more difficult.

8. *Classification.* The jail has a rudimentary classification system. An inmate entering the jail is screened for medical problems and related special needs by a medical staff person located in the intake area. Such problems are thus identified at the time an individual is admitted to the jail. There is no procedure for obtaining other information about an inmate at the time of intake or at any later time. Thus, no inquiry or investigation is made with respect to any prior criminal record, prior prison behavior or any social or educational background. The inmate's current charge is of course known at the time of intake, and the current charge is used to assign the inmate a color-coded armband. The categories noted on the armbands are felon—crime against property, felon—crime against person, public drunk, misdemeanor, parole violation and federal inmate.

After an inmate has gone through the intake process, he is held in lower level housing. When he is moved into general population, the armband is intended to be used as a method of assigning him to a particular pod on the third or fourth floors. The testimony was that the third floor is principally a floor for persons charged with or convicted of felonies, while the fourth floor is principally for persons charged with or convicted of misdemeanors. In practice, however, the armband system is often not followed, except as to federal inmates, who are assigned to a separate pod. There are also certain other categories of prisoners who are assigned to particular areas, although no armband color is used to designate their assignment. These include male homosexuals, Muslims, and juveniles, all of whom are segregated from the rest of the population. In addition, those with medical problems or needs are assigned to the second floor. The jail has maximum security and protective custody areas.

**4.** This testimony finds some support in compilations of disciplinary reports involving fights, weapons and threats submitted by the state defendants. These show that the number of such disciplinary reports dropped sharply in May and June 1989, at the time the jail population and the number of altercations were at their highest levels to date. If the disciplinary system was being properly utilized, one would expect an increase in violent disciplinary reports at that time.

Once an individual receives an initial housing assignment, future decisions concerning his classification and placement within the facility are made based on his behavior. Classification decisions after the initial assignment can best be described as *ad hoc* decisions made by a deputy jailer and triggered by a fight or by an inmate's request to be moved for some valid reason, such as fear of other inmates in his pod. When inmates are involved in a fight, the jail typically moves all of the participants. When the decision to move an inmate is made, the deputy jailer has information about the specific incident that occasioned the move. On occasion he may have some personal knowledge of the prior behavior of the inmate being moved. If not, in order to find out about the inmate's prior behavior, he would have to research jail shift logs and other jail records; there is no record to which he could turn that would include the reasons for an inmate's prior moves. Thus, an inmate who is a troublemaker can be moved all over the facility without any jailer having information as to where he has been previously housed and what his difficulties were in prior housing. Similarly, the deputy jailer who moves an inmate has no information, other than jail grapevine or chance personal knowledge, about the inmates in the area to which the inmate is being moved. When these *ad hoc* decisions are made, no one is assigned responsibility for determining that the move is an appropriate one from a classification standpoint.

The evidence at trial strongly supports the conclusion that the jail's rudimentary classification system is not functioning. With the exception of the federal pod, there are simply no areas in the jail assigned to the particular categories of offenses denoted by the armbands. In addition, other evidence about the wide variety of inmates housed in particular areas casts serious doubt as to the success of any efforts to put felons on one floor and misdemeanants on another.

Although the functioning of the existing system is an issue, an equally important issue is the adequacy of the system. The evidence at trial established a widespread failure to separate inmates with violent propensities from nonviolent inmates. Plaintiffs presented proof of many instances of inappropriate mixes of inmates. Pretrial detainees charged with non-violent offenses with relatively low bonds,[5] individuals convicted of nonviolent misdemeanors, pretrial detainees charged with extremely serious and violent crimes with high bonds and individuals convicted of one or more serious violent crimes apparently are indiscriminately distributed throughout the facility. Some of the inappropriate mixes would be eliminated if the jail adhered to its armband system, but others would not be. Under the current system, jail officials simply do not obtain and utilize much information pertinent to a determination of whether an individual is violent or nonviolent. The conclusion is inescapable that there is no effective separation of violent and nonviolent inmates.

Classification at the facility has been a problem for quite some time. Reports in 1988 from the Tennessee Corrections Institute, the state agency that inspects local jails, found that the jail's classification system was inadequate. In May 1988 the TCI inspector's report stated, "It seems clear that the jail's classification system under present condition (sic) is inadequate and unsafe for prisoners and staff." Although changes in classification have been made since that time, the statement is still true today.

9. *Violence.* The factual proof at trial concerning violence came from three sources—jail records, inmate testimony and testimony of jail officials. All three sources reveal that violence within the Shelby County Jail is pervasive and has become a very serious problem.

Statistics derived from jail records reveal the following numbers of inmate altercations for 1988 and 1989:

---

**5.** While under Tennessee law the sole purpose of the bond is to procure presence at court proceedings, the amount of the bond still indicates to some extent the seriousness of the current charge and a judicial officer's assessment of the individual for whom the bond is set.

| 1988 | |
| --- | --- |
| January | 88 |
| February | 64 |
| March | 55 |
| April | 53 |
| May | 46 |
| June | 73 |
| July | 57 |
| August | 55 |
| September | 74 |
| October | 105 |
| November | 95 |
| December | 86 |
| TOTAL | 851 |

| 1989 | |
| --- | --- |
| January | 90 |
| February | 96 |
| March | 96 |
| April | 105 |
| May | 164 |
| June | 134 |
| TOTAL (Year to Date) | 685 |

While there was much dispute at trial about these statistics, the rate of increase in violence for the first six months of 1989 was significantly greater than the rate of population increase. The average jail population for the first six months of 1989 was 2,268; for the last six months of 1988 the average was 1,954. The rate of increase is 16%. The number of altercations for the first six months of 1989 was 685; the number for the last six months of 1988 was 472. The rate of increase is 45%.

Jail records do not reflect the number of sexual assaults from January through June 1988; nor do they contain a figure for sexual assaults in October 1988 or June 1989. The available records show the number of sexual assaults as follows:

| 1988 | |
| --- | --- |
| June | 4 |
| July | 1 |
| August | 1 |
| September | 1 |
| November | 3 |
| December | 4 |

| 1989 | |
| --- | --- |
| January | 0 |
| February | 0 |
| March | 2 |
| April | 3 |
| May | 4 |

Incomplete incident reports from July 1989 showed five rapes during July.

Jail records almost certainly do not accurately reflect the number of sexual assaults in the jail. Inmates who claim that they were raped in the jail are typically referred to the Rape Crisis Center, an agency which is not affiliated with the jail. The director of the Rape Crisis Center, Mary Durham, testified at trial that thirteen male inmates of the Shelby County Jail were brought to the Rape Crisis Center in 1988. Between January and June 1989, twenty-one male inmates who claimed to have been raped were referred to the Rape Crisis Center. Among these twenty-one individuals was one individual who had been referred to the center five or six times. The twenty-one inmate figure from the Center is obviously much larger than the jail's number of nine sexual assaults in 1989. Although jail figures for July indicated five alleged rapes during that month, the Crisis Center records indicated that eight individuals had been referred to the Crisis Center from the jail during July. The possibility of significant inaccuracy in the records is increased by the fact that the term sexual assault would seem to be broader than the term rape; thus presumably the sexual assault figures include assaults in which no actual rape occurred. Although the Rape Crisis Center figures do not permit a reliable finding as to the number of sexual assaults in the jail in 1988 or 1989, the true figure is apparently larger than that listed on jail records.

Jail records also include figures concerning the number of inmates examined by the medical department as a result of being involved in an altercation. Jail policy is

that each inmate involved in an altercation is examined, whether or not he is actually injured. Thus these figures reflect numbers of inmates involved in fights for a given time period. These records indicate that between January 3 and June 4, 1989, 1,037 inmates were involved in altercations and examined by the medical department.

Figures with respect to number of inmates transported to the hospital in May and June 1989 because of injuries received in fights were presented. In May forty-two inmates were taken to the hospital and during the first three weeks in June sixty-three inmates were taken to the hospital. Since inmates who are not seriously injured in a fight are treated in the medical department at the jail, these figures fairly represent the number of inmates who were seriously injured in fights during this time period.

Plaintiffs presented much general evidence relevant to the level and pervasiveness of violence in the facility. In addition, plaintiffs presented evidence of specific incidents of violence. With respect to violence generally, plaintiffs presented the testimony of five inmates and one former deputy jailer. Inmate John Doe No. 1[6] testified that he saw fights two times a day during the three to four weeks that he was housed on the third floor of the jail. One of the common reasons for these fights was gambling over food. John Doe No. 1 indicated that frequently guards did not intervene in these fights. John Doe No. 1 was later moved to the fourth floor for two days. There he saw one fight which was broken up by other inmates. After that he was moved to the second floor for two to three weeks, where he saw one fight, which involved the theft of food. On one occasion John Doe No. 1 saw a guard beating an inmate and also witnessed other guards joining the beating.

Inmate John Doe No. 2 testified that he saw frequent fights during his stay in the jail. In particular, he mentioned fist fights and stabbings with ink pens. Inmate Rob-ert Brockert indicated that he witnessed one or more violent incidents daily. John Doe No. 3 said that during the time he was housed on the third floor, he saw two or three fights per day. He testified that guards did not intervene in some of these fights. Fights were especially bad on commissary night. Don Triplett, a former deputy jailer who is now a correction officer at FCI Memphis, corroborated the inmates' testimony concerning the level of violence. Triplett worked in the jail for four years and indicated that three fights per shift was typical during his tenure as a deputy jailer. Triplett indicated that he had only known of two rapes during the period he was employed as a deputy jailer.

In addition to the generalized testimony about the level of violence, plaintiffs presented proof of many specific incidents of violence at the jail. All jail incident reports for May and the first three weeks of June 1989 were admitted (Exhibits 2 and 3). These detail numerous fights. With respect to many of the fights, guards apparently did not intervene or even witness any part of the fights. Involvement by jail personnel in these instances was after the fact, when the inmates involved in the fight were taken to the medical department and assigned to new housing.

Five inmates testified concerning specific incidents of violence at the jail. Defendants did not seriously challenge the credibility of these inmates with respect to their accounts of these incidents. The court therefore accepts the inmate versions of these incidents as true in all material respects.

Inmate John Doe No. 1, who is twenty years old, has never been convicted of a crime. He completed twelfth grade at a school for slow learners and handicapped individuals. He entered the jail after his arrest for fraudulent use of a credit card and robbery. While he was housed on the third floor, three inmates called him into a cell and made a verbal sexual overture to

---

**6.** Three inmates were permitted to testify without giving their names in open court due to the nature of the violence to which they had been subjected. The court refers to these as John Doe No. 1, John Doe No. 2 and John Doe No. 3. The numbers relate to the order of the testimony of these individuals, with John Doe No. 1 being the first John Doe inmate to testify.

him. When he tried to walk out, the inmates hit him and pulled his pants down. John Doe yelled once, but the other inmates hit him and knocked him out. After the incident John Doe No. 1 did not immediately notify guards of what had occurred. He was afraid of the inmates who had attacked him, and they followed him around to check on him. After he returned from court the next day, he advised the guard that he was not going back in the pod and of the reason for this refusal. John Doe No. 1 was then moved to the fourth floor. After a period on the fourth floor John Doe No. 1 was moved to the second floor due to psychiatric problems. On the second floor he was pulled into a cell by another inmate and was bound and gagged. The other inmate struck and raped him. At this point John Doe No. 1 was moved to protective custody. After he attempted suicide, he was moved to the suicide tank.[7]

John Doe No. 2, age twenty-nine, was in the jail charged with violation of probation and a marijuana offense. When moved from the lower level, he was housed in the pod in which male homosexuals are incarcerated. In this pod he was raped by two other inmates. He screamed, but could not get to the button to summon guards. He revealed what had occurred subsequently on his way to court and as a result was moved back to the lower level into a single cell.

Charles Lee, age thirty-seven, has one criminal conviction, a 1983 conviction for DWI. He was recently a pretrial detainee in the jail on a grand larceny charge. He was moved from lower level housing to a general population pod at 3:00 a.m. on a Sunday morning. Six or seven other individuals entered the pod at that same time. The inmates who had previously been in the pod surrounded the new inmates and attempted to intimidate them. They took personal belongings from the new inmates, such as new tennis shoes, towels and soap.

After breakfast the other inmates put the new inmates in the center of a ring of inmates and began to fight each of them. When it was Lee's turn to fight, four inmates jumped on him and beat him until he was unconscious. Lee's cheekbone and nose were broken in this incident and his teeth were knocked out. Apparently this fight became a serious brawl, because twelve other inmates were hurt in the same altercation. Fifteen to twenty guards came to break up the fight.

Lee was hospitalized as a result of this altercation and testified that he missed his court date because he was in the hospital. After his release, he was arrested on a warrant for failure to appear and was returned to the jail. On his second stay in the jail Lee was assigned to a different pod from the one in which he had been housed on the first occasion. The situation on the first night in this pod was similar to the first night in general population during his first stay in the jail. The inmates took property from the new inmates and "punched on" them. On this occasion Lee also witnessed inmates setting up a plot to ambush an inmate who was expected to be moved into the pod. This new inmate was an enemy to inmates who were already housed in the pod. When the new inmate entered the pod, the plotting inmates struck him with weapons, including a three-foot pipe. Lee testified that he was afraid to report this incident.

Robert Brockert, age thirty-five, is in the jail as a result of the revocation of his parole from a sexual battery conviction. He also has another currently pending charge. While Brockert was housed in one general population pod, he was physically attacked two times by inmates who were trying to take his commissary food. He was subsequently moved to another general population pod. In this pod he received a warning of an attack by black inmates who did not want white inmates in their cells or in the pod. Brockert is white.[8]

---

7. There was some proof at trial concerning conditions in the suicide tank. The court does not understand these conditions to be an issue in this case, based on the pretrial order and plaintiffs' proposed findings of fact and conclusions of law.

8. The jail population is mostly black; whites comprise a small minority of the population.

Although he told guards about this warning, no action was taken. Brockert was subsequently attacked by approximately ten black inmates. He sustained head and back injuries and three broken teeth. Other white inmates were also victims in this attack.

Brockert also testified about conduct of guards. He said that he had seen an incident in which five guards watched an inmate beaten unconscious by other inmates. He testified about another incident in which he said three guards watched a one-on-one inmate fight and delayed calling for help. Brockert also testified to one incident in which a guard beat an inmate. While Brockert's testimony about his own injuries was credible, the court draws no inferences of improper conduct on the part of jailers from this testimony. First, as the proof demonstrated, guards obviously cannot enter pods or break up fights until adequate backup guards have arrived. Second, with respect to the beating testimony the distinction between necessary force to restrain an inmate and excessive force is often difficult to determine. Without more specific proof concerning these incidents, the court cannot make findings as to precisely what occurred.

John Doe No. 3 testified that he was raped by three individuals who cornered him in a cell. Initially, the individuals joked with him. Finally, they beat him up and each of them raped him. John Doe No. 3 told the guard about this incident at the next meal.

The testimony of jail officials largely corroborated plaintiffs' proof concerning the level of violence in the institution. Two captains in the jail who serve as shift commanders, Dwight Thomas Hale and Jacqueline Israel, testified. Hale, who had been with the sheriff's department for nineteen years, testified that the current jail population includes younger and more aggressive inmates than those in prior years. He stated that many gang members are now in jail. As a result, he said that altercations in which gangs jump on smaller groups have become prevalent. The injuries inflicted in such an altercation are typically greater than those involved in a one-on-one fight. Hale attributed the presence of gangs in the jail to sweep law enforcement operations which bring in a number of people from the same neighborhood. Hale confirmed that two to three fights per shift would be a typical number of altercations. Finally, Hale indicated that inmates commonly refuse to identify their attackers because they are afraid. When this occurs, no disciplinary proceeding is possible. Hale's opinion was that the level of violence currently is the same as it has been the last few years, although he believes that the nature of the violent incidents and the resulting injuries has changed to more group altercations and more serious injuries. He stated that the level of security in the institution was good.

The other shift commander, Jacqueline Israel, conceded that fights in the jail were common and that three fights on a particular shift were not unusual. She also indicated that large numbers of individuals were commonly involved in a single fight. She indicated that this situation resulted from the existence of cliques or gangs within the facility. Israel said that it was typical for inmates to refuse to identify their attackers.

Claudette Laney, who is in charge of the medical department at the jail, gave her opinion that the medical department has seen more serious injuries as a result of altercations during the last few months than previously. Laney has been at the jail since 1982. She testified that many inmates were saying that several inmates jumped on them, and that often they would say that inmates from a particular area of town had attacked them.

Ken Rook, who is the executive officer of the jail and second in command in the jail division of the sheriff's department, indicated that the jail has an internal gang problem. He stated that fights are no longer simply one-on-one altercations, but that violence has increased both in terms of the number of incidents and their seriousness.

Chief jailer Clard Baker, head of the jail division of the sheriff's department, did not

testify at trial. Plaintiffs, however, presented an excerpt from a recent television news interview with Baker concerning a fight at the jail. On the Channel 5 evening news Baker stated, "It's not racial at all. It's just the jail being overcrowded. And with the population we have in the jail today, you're going to have fights."

### B. The Expert Testimony

Three expert witnesses testified at trial. All three reviewed documents, toured the jail and interviewed jail officials and inmates in preparation for their testimony. Their testimony included both their factual findings about the jail and their various opinions about jail conditions and the causes of these conditions.

Plaintiffs presented the testimony of Gordon Kamka. Kamka is a criminal justice management consultant who also serves as director of the facilities review panel, a jail monitoring group, for the West Virginia Supreme Court. His prior employment includes Secretary of the Maryland Department of Public Safety and Correctional Services (the member of the governor's cabinet responsible for correctional facilities and issues), warden of the Baltimore City Jail, and superintendent of the Maryland Reception Diagnostic and Classification Center. Kamka also was in the United States Air Force for eight years, working this entire time in corrections and law enforcement and attaining the rank of Captain. Kamka has testified as an expert in fifty-one or fifty-two jail or prison cases and has usually testified for plaintiffs.

Kamka described the jail as "severely overcrowded." The jail's worst problem, however, according to Kamka was the "serious and severe violence." Kamka noted that in walking through the jail he observed numerous visible injuries to inmates and that Claudette Laney had confirmed to him that there was a serious increase in assaults and trips to the hospital. Kamka found the number of "walking wounded" in the jail "shocking" and described the jail as similar to a "war zone."

Kamka's opinion was that the level of violence in the jail is attributable to a num-ber of causes. Foremost among these is overcrowding. Kamka noted that a slowly rising population often generates violence that increases at a greater rate than the population is increasing. He said such an increase is occurring in the Shelby County Jail and described the increase as "geometric." Other causes of the violence are lack of staff to observe inmate behavior, inability to discipline inmates, lack of security devices, lack of programs, the pod man/phone man system, scarce resources, low staff morale, racial problems, gangs in the facility and an inadequate classification system. Kamka discussed many of these causes of violence individually. Kamka conceded on cross-examination that another cause of violence was the violent propensities of people who are in jail. He indicated that it is hard to give a level of expected violence in a facility.

Kamka's opinion was that the number of jailers was completely inadequate for the facility. Under current conditions, he said, officers cannot patrol and supervise inmates, even if they are conscientious about performing their duties. He noted that there is high staff turnover as well, thus resulting in a large percentage of inexperienced staff people.

Kamka criticized the pod man/phone man system, saying that it is always bad policy for inmates to control other inmates. In addition, this sort of inmate control increases violence in the facility.

With respect to crowding, Kamka noted that crowding increases contact between people and thus provides opportunities and incentives to violent behavior. He said that a facility operates optimally at ninety percent of its design capacity. If the facility is slightly below design capacity, there is room to move inmates around to make repairs in the facility and there is also space for groups of individuals arrested at one time by large law enforcement operations. Also, at this population level an institution can maintain effective disciplinary and classification systems.

Kamka noted that there is great racial imbalance in the jail. He stated that there is a huge black population that preys on a

small white population. He said that this behavior is typical of any majority group. He said that the inmates also victimize young, weak or effeminate inmates.

Kamka noted the lack of activities in the jail. He said that inmates need to be kept busy in order to reduce violence and dangerous or illegal activities. He found the amount of recreation and the degree of visitation between inmates and family members to be inadequate.

Kamka found sanitary conditions in the jail to be mixed. He indicated that there was a scarcity of resources, which led to fighting.

Kamka described the classification system as "dysfunctional." He found a "mixed bag" of inmates in each pod. This lack of a classification system increases violence. Kamka also described an adequate classification system. He stated that such a system must obtain information about the individual's prior record, current charges, emotional and physical health, work history, family background and military history. He said that the ideal system resulted in grouping people with similar propensities together. In Kamka's view, an appropriate classification system cannot function in an extremely crowded facility.

Kamka's opinion was that medical services in the facility were inadequate. The medical department is understaffed. He indicated that the staff cannot meet the needs of the population, given the number of assaults in the facility. Kamka noted that the time between an inmate's request to see a medical staff and his visit to the medical department varies greatly. Kamka was particularly concerned that there was no area used for the detoxification of alcoholics and no regular sick call.

Kamka described the situation with the law library and the jailhouse lawyers. He noted that few people were using the law library.

Kamka noted problems with a huge caseload carried by counsellors. He also found the training of the counselling staff to be inadequate.

Norman R. Cox, Jr. testified as an expert witness on behalf of the defendant sheriff. Since 1981 Cox has owned a corrections consulting firm. He has been employed as a college teacher in criminal justice and corrections areas, director of the county jail in San Antonio, Texas, superintendent of pre-release activities for the Virginia Department of Correction and two supervisory positions with the Virginia Probation and Parole Board. Cox also served in the United States Army for four years, rising to the rank of captain. He was a strategic/tactical intelligence officer in the military intelligence branch. Cox has been an expert in a number of jail or prison cases.

Cox prepared for his testimony in a manner very similar to that utilized by Kamka. His approach to describing problems at the jail was extremely academic, however. Initially, Cox distinguished between crowding and overcrowding. Crowding, he said, occurs when a facility's population consistently exceeds its design capacity. Overcrowding occurs only when the population consistently exceeds the functional capacity of the facility. The functional capacity of the facility is the percentage of the design capacity up to which basic services can be maintained in the facility. Given these definitions, Cox stated that the Shelby County Jail is crowded and shows "periodic signs of overcrowding."

Cox gave a lengthy explanation of psychological factors that cause violence in prisoners. He indicated that crowding may be related to violence, but that a link between crowding and violence in a facility is unlikely if crowding increases, but the presence of psychological factors leading to violence does not increase.

Cox agreed with Kamka that violence in severely crowded institutions may increase geometrically while the population increases in a linear fashion. He indicated, however, that this is not occurring in the Shelby County Jail. From this Cox concludes that psychological factors leading to violence have not increased in the Shelby County Jail and that there is no link between crowding and violence in this facility.

With respect to the level of violence in the facility, Cox attributed the unusual number of violent incidents in May 1989 to this court's order requiring the movement of inmates from the gym. Cox's opinion was that the movement of inmates into the pods increased uncertainty, stress and violence. Cox noted that 6 to 6.5 altercations per 100 inmates is a danger signal in a facility like the jail. Only in May 1989 and January 1988 has the jail met this danger signal mark. Cox confirmed the increase in altercation injuries beginning in February 1989. His view was that organized gang activity within the jail began at about that time.

With respect to injuries from altercations, Cox disputed Kamka's findings and observations that the jail was like a "war zone." To support this view he cited his own observation and conversations with public defenders.

Cox indicated that additional staff was necessary for the jail. He felt new staff was required in order to maintain basic services.

Cox stated that maintaining recreation was very important for inmates and gave his opinion that recreation had resumed at the facility. He found no fault with visitation, opportunities for legal research, sanitation or medical services. In his view all basic services had been maintained within the facility. Lapses are temporary and have been corrected as soon as possible.

With respect to classification, Cox found the classification system adequate. He stated that inmates are categorized principally by crime and offense and secondarily by their behavior after entering the institution. He believed that classification on this basis was carried out to a meaningful extent. Cox affirmed his statements in a 1988 speech to corrections professionals that maintaining classification was critical in managing a crowded facility.

On cross-examination, Cox conceded that he had previously testified that severe crowding exists when an institution exceeds 150 percent of its design capacity. Although the Shelby County Jail exceeds 200 percent of its design capacity at times, Cox was willing to say only that it had periods of overcrowding. He noted that the jail was being used as a dormitory institution now, while it was designed for use as a cell institution. Cox conceded that in talking with reporters after his direct examination, he had said that the situation in the jail was "dangerously close" to a situation in which his opinion would change with respect to crowding, violence and the link between these two.

Plaintiffs also questioned Cox about comparative figures showing the level of violence at other institution. Plaintiffs introduced the Tennessee Department of Correction annual report showing that the state prison system, which houses approximately 7,500 inmates, had only 112 inmate-on-inmate assaults in 1987–88. Plaintiffs also questioned Cox about statistics, which were admitted into evidence, showing that numbers of inmate assaults in state prisons nationally ranged from 21.56 per 1,000 inmates for minimum security to 26.16 for maximum security. Although Cox acknowledged that these figures represented [9] fewer violent incidents than the Shelby County Jail, he explained that less violence was to be expected in a prison system in which inmates have greater certainty about their situations and less stress.

The state defendants presented the testimony of Michael J. Mahoney. Mahoney is executive director of the John Howard Association, a jail advocacy group which is also involved in monitoring jails and prisons for various courts. Mahoney testified that the jail was delivering basic sanitation services and that the medical services were adequate. With respect to classification, he said that a system of initial armband classification and further classification based on jail behavior existed and appeared to be functioning.

---

**9.** Cox also said that he had insufficient information about the national figures to comment on them. These national figures do not specify whether they refer to number of assaults or number of inmates involved in assaults. Whatever the meaning, a comparable figure for the Shelby County facility for 1988 or 1989 would be much higher.

Mahoney felt that the inmates needed to get more recreation. He described the pod man/phone man system as an "unacceptable corrections practice," but said it was preferable to no system in the absence of staff-controlled services. With respect to the access to the courts issue, Mahoney found the materials in the legal room totally inadequate and indicated that, based on available forms and other legal assistance, he considered it very difficult for the inmates in the jail to get access to the courts.

With respect to violence, Mahoney emphasized that any violence was unacceptable, although typically unavoidable in a jail or prison. He also disputed Kamka's characterization of the jail as a "war zone" and indicated that the growth in violence at the jail was not geometric.

While the testimony of all three experts was helpful to the court, the court cannot accept the views of any one of them in their entirety. With respect to the violence issue, Kamka's characterization of the jail as a "war zone" was an exaggeration. In addition, his opinion that the increase in violence at this time was geometric rather than linear is unsupported by the statistics, if they are viewed over the entire relevant time period. Yet, despite these deficiencies, the focus of his violence analysis was more persuasive to the court than the assessment offered by either Cox or Mahoney. Cox's entire discussion of violence centered primarily on disputing Kamka's assertion that there was a link between crowding in the facility and violence. In Cox's view this link could be established only if the increase in violence was geometric while the increase in population was linear. This approach tends to neglect an examination of whether the level of vio-. lence is an acceptable one, without regard to its rate of increase. Mahoney's approach was similar to that of Cox, yet there was a difference. Mahoney seemed to consciously avoid any implication that the current level of violence in the Shelby County Jail or in fact any particular level of violence in an institution is acceptable. In contrast to Cox and Mahoney, Kamka focused on the realities of day-to-day violence in the institution, conveyed to him by his own observations and conversations with inmates and jail staff. Kamka's view of the facility is the view that is reflected in the lay testimony of jail officials as well as inmates.

Cox's violence analysis suffers in one other specific respect. Cox stated his view that the high level of violence in May 1989 was caused by this court's order that the gymnasium no longer be used for housing after May 15. The proof, however, indicated that by far the greater number of violent incidents in May occurred prior to the court's order rather than after it. Thus, Cox's analysis inappropriately de-emphasizes the high number of assaults in May and June 1989.

With respect to classification, at times Cox and Mahoney seemed to be describing a fictional system of classification for the jail bearing little resemblance to the one about which jail officials testified. Finally, through questioning Mahoney, the court was convinced that he did in fact understand the nature of classification decisions at the jail. Mahoney's principal point seemed to be that deputy jailers are well equipped to make good judgments about moving inmates based on their behavior in the jail. The court recognizes that deputy jailers do acquire a great deal of knowledge concerning the inmates in the institution. They also acquire experience and a good intuitive understanding of the nature of inmates. Thus, they are equipped to make good decisions about moving inmates. Their ability to do so, however, in this facility is seriously compromised by the lack of readily available information about the particular inmate being moved and the area to which he is being moved. Cox and Mahoney's opinion about classification could be paraphrased as, "the system must be working or there would be even more violence." By contrast, Kamka's description of the inadequacies in the jail's classification system was very convincing to the court. It was also supported by the lay testimony. Further, it is consistent with common sense, which dictates that a more effective classification system that

groups similar inmates together would result in decreased violence.

With regard to certain other areas, the testimony of Cox and Mahoney was more in accord with the lay proof about the realities of jail life than was that of Kamka. They accurately described medical services, which they concluded were generally well-delivered, despite occasional lapses. In fact, the situation with respect to medical services was surprisingly good, given the level of crowding and the need for more medical staff. Cox and Mahoney also gave the more accurate account of sanitary conditions in the facility.

Finally, there were certain areas in which there was no substantial disagreement among the experts. All apparently agreed that more recreation was required although Cox said recreation had "resumed." All believed that there was a need for more staff within the facility. Mahoney and Kamka testified consistently concerning legal services and facilities.

## II. CONCLUSIONS OF LAW AND LEGAL ANALYSIS

The parties concede that the court has jurisdiction of this matter.

Plaintiffs' claims arise under the Eighth and Fourteenth Amendments. The members of the plaintiff class who have been convicted of crimes assert that jail conditions constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The United States Supreme Court has set forth the general framework under which such claims are considered in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* at 347, 101 S.Ct. at 2399. Although the definition of cruel and unusual punishment is defined by contemporary standards of decency, " 'Eighth Amendment judgments should neither be nor appear to be merely the subjective views' of judges." *Id.* at 346, 101 S.Ct. at 2399 (citation omitted). Pro-

hibited conditions "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399.

The Sixth Circuit Court of Appeals has further interpreted the *Rhodes* framework in *Walker v. Mintzes*, 771 F.2d 920 (6th Cir.1985). In *Walker* the Sixth Circuit rejected an approach that would permit basing an Eighth Amendment violation on the totality of the circumstances, even when no specific prison condition violated the Eighth Amendment. 771 F.2d at 925. The court articulated the proper standard in this circuit for considering Eighth Amendment conditions claims.

[We] instead interpret *Rhodes* to require consideration of all the prison's conditions and circumstances, rather than isolated conditions and events, when addressing eighth amendment claims. In certain extreme circumstances the totality itself may amount to an eighth amendment violation, but there still must exist a specific condition on which to base the eighth amendment claim. We believe such conditions, "considered alone or in combination [with other conditions]," (citation omitted) must amount to a deprivation of "life's necessities" (citation omitted), before a violation of the eighth amendment can be found.

*Id. Accord, Groseclose v. Dutton*, 829 F.2d 581, 585 (6th Cir.1987). *Cf. Bellamy v. Bradley*, 729 F.2d 416, 420–21 (6th Cir. 1984) (apparently approving a totality of the circumstances analysis in conditions cases).

■ The pretrial detainee plaintiffs assert their claims under the Fourteenth Amendment's due process clause. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979), provides the proper analysis for determining whether the pretrial detainees' substantive due process liberty rights have been infringed:

In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those condi-

tions amount to punishment of the detainee.

The meaning of "punishment" within the context of *Bell v. Wolfish* does not wholly coincide with the lay definition of "punishment." An actual intent to inflict punishment on the part of jail officials need not be present. Specifically,

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. (citation omitted) Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." (citation omitted) Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 538–39, 99 S.Ct. at 1873–74.

Although the constitutional challenges of the convicted members of the plaintiff class and the pretrial detainee members derive from different portions of the Constitution, in practical terms the standard for determining whether either category has been deprived of constitutional rights is the same. The court in *Bell v. Wolfish* noted that "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Id.* at 545, 99 S.Ct. at 1877. Further, "the

eighth amendment rights of prisoners are analogized to those of detainees under the fourteenth amendment, to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial." (citations omitted). *Roberts v. City of Troy,* 773 F.2d 720, 723 (6th Cir.1985). *See also Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir.1985).

■ Plaintiffs do not claim that each area of claimed inadequacy at the jail rises to the level of a constitutional violation,[10] but rather assert that seven conditions violate the constitutional rights of jail inmates. These are 1) indifference to needs for medical and dental care, 2) poor sanitation, 3) absence of opportunities for exercise, 4) absence of an adequate classification system, 5) pervasive violence, 6) overcrowded housing, and 7) lack of opportunities for legal research or assistance.

■ In analyzing each of these issues, the court's task is not to determine whether inadequacies or deficiencies exist in a particular area, but rather to determine whether conditions deprive inmates of essential human needs, as those needs are defined by contemporary standards of human decency. *See Rhodes,* 452 U.S. at 346–47, 101 S.Ct. at 2398–99; *Walker,* 771 F.2d at 925; *see generally Inmates of Occoquan v. Barry,* 844 F.2d 828, 835–39 (D.C.Cir.1988). Thus, the opinion of an expert or lay witness that a particular area is inadequate is by no means determinative of the constitutional issue. To be sure, the opinions are useful and relevant evidence. Inadequate and unconstitutional are not synonymous, however.

A. Specific Alleged Constitutional Violations

■ 1. *Medical Care.* In order to violate inmates' constitutional rights with respect to the receipt of medical care, officials must display "deliberate indifference

---

10. In some of the areas of proof, such as visitation, no constitutional right exists. In other areas of claimed inadequacy, such as lack of staff, there is no independent constitutional violation, but the inadequacy may cause or contribute to a constitutional violation. Proof about all of these areas is relevant, however, not only because the court must consider "all the prison's conditions and circumstances," *Walker,* 771 F.2d at 925, but also because the court must ultimately determine causes of and relief for any constitutional violations.

to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). "Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980). When the entire system for delivering medical services is challenged, deliberate indifference to inmates' health needs may be shown by proving repeated examples of denials of medical care which disclose a pattern of conduct by the prison medical staff, or "by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Id.*[11] Thus, inmates may establish deliberate indifference by proving that the conduct of jail officials with respect to the overall procedures for providing health care at the facility meets the deliberate indifference standard.

■ Plaintiffs have failed to establish "deliberate indifference to the serious medical needs" of prisoners at the Shelby County Jail. Plaintiffs did establish that certain inmates did not receive prompt medical attention.[12] In the case of Jeremiah Triplett, the conduct of the guard was callous and inexcusable. Yet plaintiffs have failed to establish that such incidents occur with sufficient frequency to violate the rights of the plaintiff class to medical care.

To be sure, the medical department at the jail could utilize more staff very effectively. Crowding has put a great strain on the existing medical resources. The proce-

dures for rendering medical care were entirely appropriate, however, and any interference with the delivery of those services due to crowding was not sufficient to create a constitutional violation. At this time the medical department is functioning better than might be expected under very difficult circumstances.

■ 2. *Sanitary and Hygiene Conditions.* Sanitary living conditions and personal hygiene are among the necessities of life protected by the Eighth Amendment. *See Harris v. Fleming*, 839 F.2d 1232, 1235–36 (7th Cir.1988); *Green v. Ferrell*, 801 F.2d 765, 771 (5th Cir.1986); *Walker*, 771 F.2d at 928; *Ramos*, 639 F.2d at 567–70. Courts are extremely reluctant, however, to find constitutional violations based on temporary deprivations of personal hygiene and grooming items. *See, e.g., Harris*, 839 F.2d at 1235. In evaluating the facts of this case, the court must consider whether the plaintiffs established any deprivation of sanitation and personal hygiene that would constitute "wanton and unnecessary infliction of pain" or "a deprivation of the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

■ The proof with respect to sanitary conditions in the facility does not establish a constitutional violation. While the proof demonstrated that toilets and showers frequently have to be repaired, as would be expected in a crowded facility of this size, it failed to show any undue delay in repairing these items. The level of cleanliness, while not outstanding, was adequate. No deprivation of the life necessity of sanitary conditions has occurred.

---

**11.** *Ramos* refers to repeated examples of negligent acts. Whether or not negligent acts, even repeated ones, can be the basis for a constitutional violation is very questionable under current law. Plaintiffs can still, however, establish deliberate indifference by proving systemic inadequacies or repeated acts of denial of medical care. *Ramos* thus accurately describes the typical method of proving deliberate indifference in a conditions case.

**12.** The court makes no finding as to whether the individual inmates who testified might have valid constitutional claims arising out of the denial of medical services to them. Even if these individuals have valid claims, however, this would be insufficient to establish an unconstitutional denial of medical care to the plaintiff class. A few incidents of denial of medical care, insufficiently supported by other proof, do not meet plaintiffs' burden of establishing a basis for declaratory and injunctive relief.

With respect to personal hygiene items, individuals on the lower level do not receive a change of clothing or personal grooming items such as toothbrush and toothpaste until they are moved into the general population. In addition, inmates in the lower level on occasion are not furnished toilet paper, towels, sheets and blankets. While inmates are supposed to be in lower level for no more than seventy-two hours, longer stays are not infrequent. Jail officials testified about the delivery of supplies to all areas of the jail, including the lower level. The expert testimony about the presence of supplies on the lower level was conflicting. Any deficiency in the delivery of supplies to the lower level is not caused by jail policy, but simply by strain on jail resources due to crowding. In addition to the proof about supplies on the lower level, there was some evidence about delays in receiving mattresses. Jail officials conceded that on two occasions the jail had run out of mattresses and had to procure more mattresses, resulting each time in a period of several days during which new inmates did not receive a mattress.

Short term deprivations of toilet paper, towels, sheets, blankets, mattresses, toothpaste, toothbrushes and the like do not rise to the level of a constitutional violation. On the other hand, frequent or long term deprivations of such items would deprive inmates of constitutional rights. On this record the court cannot find that such deprivations occur with sufficient frequency or are sufficiently long term to amount to a constitutional deprivation.

■ 3. *Opportunities for Exercise.* As the United States Court of Appeals for the Sixth Circuit observed in *Patterson v. Mintzes,* 717 F.2d 284, 289 (6th Cir.1983), "[i]t is generally recognized that a total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees." Such a near-total deprivation of opportunities for exercise exists in the instant case.

The evidence in this case clearly supports a finding that inmates in the Shelby County Jail have virtually no opportunity for exer-

cise or recreation. Certain of the recreation areas were used for inmate housing until recently and, consequently, inmates had no recreational opportunities during this time period. Even after the recreation areas were cleared, however, the situation did not dramatically improve. The most recent figures with respect to recreation indicate that at best most inmates are currently participating in recreation no more than once a month. In fact, jail figures indicate that use of the recreational facilities in the jail prior to the time the gym was used for housing was not much more extensive than at the present time. While some inmates remain in the jail for a short time, many are there for months or longer. No penologicial justification for the unavailability of exercise opportunities was offered. Defendants do not argue that crowding and lack of staff provide penological justification for the lack of exercise, and such an argument would be without merit.

In connection with the exercise issue, the County Mayor and Board of Commissioners suggest that the court should find no constitutional violation because of the sheriff's intention to utilize the gymnasium areas more fully in the future. Certainly the court will consider any future plans at the relief stage of this hearing. At this time, however, the court must rule on the constitutionality of present, not future, conditions in the jail.

The sheriff suggests, without citing any authority in support of his argument, that recreation should properly be considered not as an independent constitutional violation, but as a cause of other conditions, such as violence. Certainly, a lack of exercise may be related to other constitutional violations. *See* discussion *infra* at 687–88. In addition, this court has doubt as to whether a deprivation of exercise would rise to the level of a constitutional violation in a conditions case, if all other conditions of incarceration met constitutional requirements. The law in the Sixth Circuit, however, as expressed in the *Patterson* case, is clear that deprivation of exercise is an independent constitutional violation, and the

court is not faced with a situation in which no other constitutional violation exists. *See infra* at 686–88. Therefore, the court follows *Patterson* and finds that lack of exercise opportunities constitutes a deprivation of the Eighth and Fourteenth Amendment rights of inmates in the Shelby County Jail.

■ 4. *Classification System.* Plaintiffs argue that the absence of an adequate classification system is a deprivation of inmates' Eighth and Fourteenth Amendment rights. The court disagrees and finds that the absence of an adequate classification system cannot form the basis for a finding of an independent constitutional violation. As the Ninth Circuit Court of Appeals noted in *Hoptowit v. Ray,* 682 F.2d 1237, 1256 (9th Cir.1982), incorrect classification does not itself inflict pain within the meaning of the Eighth Amendment.

■ A finding that the absence of an adequate classification system does not violate constitutional rights does not preclude the ordering of relief relating to the classification system, if the classification system is determined to contribute to an unconstitutional level of violence in the institution. *See* discussion *infra* at 687–88. As Judge Clure Morton explained in *Grubbs v. Bradley,* 552 F.Supp. 1052, 1124 (M.D.Tenn. 1982),

> [E]xcept to the extent that some independently protected right is implicated, inmates have no constitutional claim to any particular security classification.... Rather, the classification system is a matter ordinarily left to the expertise and discretion of prison administrators. (citation omitted). Nevertheless, if the proof shows a sufficient connection between an improper classification system and a protected constitutional right, such as the right to be reasonably free from excessive violence, there may be just

cause for court intervention in the proper case.

5. *Violence.* Personal safety is one of the essential human needs outlined in *Rhodes.* 452 U.S. at 348, 101 S.Ct. at 2400. The constitutional protection extends to a right to be free from violence and constant threat of violence. *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir.1973).[13] In determining whether prison officials have violated inmates' rights by failing to protect them from assault by other inmates, the Sixth Circuit has applied the *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), "deliberate indifference" standard. *McGhee v. Foltz,* 852 F.2d 876, 881 (6th Cir.1988).

■ In order to establish a constitutional violation of the right to personal safety, plaintiffs must establish that risk of personal harm is a "serious problem of substantial dimensions," although violence need not be "rampant." *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980). Although a single incident or several isolated incidents are insufficient to establish a pervasive risk of harm, it may be established by "much less than proof of a reign of violence and terror." *McGhee,* 852 F.2d at 880 (quoting *Withers,* 615 F.2d at 161) *accord, Riley v. Jeffes,* 777 F.2d 143, 147 (3d Cir.1985).

■ The proof at trial plainly established a high level of violence at the Shelby County Jail and a pervasive and constant threat of personal harm to inmates from attacks by other inmates.[14] Violence is a serious, substantial problem at the jail. The lay proof was entirely consistent on this point and portrayed vividly the frequency and severity of violence and the threat of personal harm to which each inmate in the jail is exposed. Jail officials testified to increasing gang activity in the

---

**13.** *Woodhous* applies a negligence standard to the conduct of officials in protecting inmates from assault or the threat of assault. While this aspect of *Woodhous* no longer correctly represents the law in this circuit, *see McGhee v. Foltz,* 852 F.2d 876, 881 (6th Cir.1988), its holding that an inmate has a right to be free from constant threat of violence is still an accurate statement of the law.

**14.** While there was some proof concerning guard-inmate altercations, plaintiffs do not contend that excessive violence by guards violates the constitutional rights of inmates.

jail, to fights involving large numbers of inmates and to increasing numbers of serious injuries. Both jail officials and inmates testified about the frequency of fights in the jail; it is apparent that every occupant and employee of the jail has constant contact with violence, frequently several times each day or shift. Inmates testified credibly about specific incidents of violence. The incident reports for May and June 1989 provide many more examples of specific incidents within the jail.

There is proof that inmates live in fear of personal harm. They refuse to identify their attackers; they are afraid to report incidents to guards. While both Cox and Mahoney said they could sense no pervasive fear or tension in the jail, the proof of inmate actions is more convincing than the experts' subjective assessments of the degree of fear or tension felt by inmates.

In addition to the proof from lay witnesses, the statistical evidence also reveals a high level of violence. Violence reached particularly high levels in May and June 1989, when 298 violent incidents occurred in a two-month period. In fact, if only these months are considered, Kamka's testimony about a geometric increase in violence may well be accurate. Violence for the first six months of 1989 increased at a rate greater than the rate of population increase. Serious injuries from altercations have also increased as have numbers of persons involved in altercations. In this jail currently housing approximately 2300 inmates, there had been 685 altercations involving 1037 inmates through June 1989. In May and the first three weeks of June 1989, 105 inmates were seriously injured. According to Rape Crisis Center figures, twenty-one inmates claim to have been raped in 1989, one five or six times; eight of those rapes occurred in July 1989.

Although the statistics are useful, they provide an incomplete picture of violence. Given the difficulty in patrolling the living areas, guards do not observe many minor fights. Since many inmates are afraid to tell guards of an incident or to identify an attacker, it is reasonable to believe that some violent incidents are unreported. For these reasons the extent of violence in the jail can just as reliably be determined from the lay testimony as from the statistical information.

While the statistics are not conclusive as to the level of jail violence, some comparison of these statistics with levels of violence in other institutions is useful. Plaintiffs presented proof at trial that only 112 assaults occurred last year within the Tennessee prison system, which has an average population of approximately 7,500 inmates. By contrast, jail records show 851 assaults during 1988 and 685 assaults through the end of June. In addition, plaintiffs presented other figures that suggested much lower levels of violence nationally in state prisons. Defendants' argument that state prisons are expected to have a lower rate of violence than jails may well be correct. Nevertheless the obvious difference in the levels of violence is so considerable that it is doubtful it can be explained solely by this contention.

 In evaluating whether jail officials have failed to protect inmates from the high level of violence and pervasive threat of personal harm at the jail, the deliberate indifference standard applies. *McGhee*, 852 F.2d at 881. The deliberate indifference standard does not require a showing of bad faith or malicious conduct on the part of jail officials; deliberate indifference does not mean callous disregard. Rather, plaintiffs can meet the standard by showing that officials through their own intentional and deliberate decisions and procedures did not protect inmates' rights to personal safety. *See Roberts*, 773 F.2d at 724; *Ramos*, 639 F.2d at 575. Systemic deficiencies in facilities, procedures or staffing can amount to a pattern of deliberate indifference. *See Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977). Plaintiffs here have made that showing. The court finds that inmates at the Shelby County Jail are exposed to constitutionally impermissible violence and threat of personal harm in violation of their Eighth and Fourteenth Amendment rights.

Although any decision as to appropriate relief will await the next stage of this

proceeding, much proof was presented at trial concerning the causes of violence in the jail. One important cause of violence in any institution is of course the inmates' own violent propensities. In this facility the gang activity within the jail has further exacerbated the violence problem. Neither the violent tendencies of inmates nor gang activity within the jail is within the control of jail officials, however.

Based on the evidence at trial, a number of other factors do cause or contribute to violence within the jail. These include insufficient security staff, the pod man/phone man system, lack of exercise opportunity, frustration over scarce resources and space, improper functioning of the disciplinary system, and an inadequate classification system. In addition, the court finds that crowding in the jail contributes to the level of violence and threat of violence. While this point was in great dispute at trial, the preponderance of the evidence is that crowding is one of a number of factors that contributes to violence. In making this finding, the court notes that the proof very strongly supported a finding that a proper classification system cannot function in a crowded institution. The evidence also was that the disciplinary system for this facility is not functioning because of crowding. Also, the lack of recreation is in part attributable to crowding, because of the difficult task of transporting large numbers of inmates to recreation with limited staff resources. Jail officials attributed the lack of outdoor recreation to insufficient staff. All three of these items—lack of a proper classification system, an ineffective disciplinary system and lack of recreation—contribute directly to violence. Deficiencies in each of these areas are related to crowding. Thus, even if crowding is not a direct cause of violence, it at least contributes to the violence problem indirectly.

In making this finding, the court does not find that crowding has created a situation in which uncontrolled violence will increase in the future in geometric progression. The court thus rejects the defense experts' proposition that there can be no causal connection between crowding and violence in the absence of a geometric increase in violence. Such a proposition defies common sense and is contrary to the evidence here. As Chief Jailer Clard Baker himself observed on the evening news, "It's just the jail being overcrowded. And with the population we have in the jail today, you're going to have fights." While crowding is not the only cause of violence in this facility, it is one of the causes.

6. *Crowding.* The analysis suggested by the many cases dealing with crowding issues is that the crowding itself is not the constitutional violation. Crowding may be viewed as cruel and unusual punishment only if it led to "deprivations of essential food, medical care, or sanitation" or if it "increase[d] violence among inmates or create[d] other conditions intolerable for prison confinement." *Rhodes,* 452 U.S. at 348. The Ninth Circuit's description of the role of the crowding issue in conditions cases accurately sets out the relationship between crowding and other claimed constitutional violations:

> Overcrowding is often the root cause of many of the complaints made by prisoners.... Overcrowding itself is not a violation of the Eighth Amendment. It can, under certain circumstances, result in specific effects which can form the basis for an Eighth Amendment violation. Overcrowding can cause increased violence, it may dilute other constitutionally required services such that they fall below the minimum Eighth Amendment standards, and it may reach a level at which the shelter of inmates is unfit for human habitation.

*Hoptowit,* 682 F.2d at 1248–49 (citations omitted).

The court has found that crowding increased violence in the institution in a number of ways. In addition, crowding has been a factor in the deprivation of exercise opportunities. Here, crowding has contributed to the violation of the inmates' constitutional rights.

7. *Access to Courts.* In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the United States Su-

preme Court defined the obligation of jail officials in assuring that inmates have meaningful access to the courts. The emphasis in *Bounds* is not on official noninterference with access to the courts, but rather on certain affirmative steps that officials must take to assure inmate access.[15] The court noted that adequate law libraries were one constitutionally acceptable method of assuring meaningful access to the courts, but that other alternatives could meet constitutional standards as well. 430 U.S. at 830–32, 97 S.Ct. at 1499–1500. The alternatives mentioned by the court were essentially methods of providing professional or quasi-professional legal assistance to prisoners. The court concludes that the legal services available at the Shelby County Jail do not meet the requirements of *Bounds*.

■ It is undisputed that the law library in the Shelby County Jail is inadequate. Despite the law library's inadequacy, defendants contend that they are complying with *Bounds* because two jailhouse lawyers are available to serve the needs of the inmate population, because inmates are freely allowed to consult with their attorneys on pending criminal cases, and because no proof was presented that an individual had been unable to file a lawsuit. With respect to proof of individuals who have been unable to file lawsuits, such proof is not essential to establish a constitutional violation of the right of access to the courts.[16] Plaintiffs have established by other proof that jail officials have deprived inmates of their right of access to the

courts. Allowing inmates to meet with the attorneys on their currently pending criminal charge does not address jail officials' obligation not to deprive inmates of access to the courts with respect to other matters. Other matters are handled soley by two untrained jailhouse lawyers, who cannot possibly serve the legal needs of the Shelby County Jail, given its current population. There is no other system under which lawyers, law students, paralegals or jailhouse lawyers provide legal assistance to inmates.

### B. Relief

■ The court will defer any decision about appropriate relief until further proof is heard with respect to the relief issues.[17] At that time the court will also consider whether the state defendants have caused any of the constitutional violations found by the court and whether any relief should be ordered against the state.

With respect to relief generally, the court is mindful that its proper role is not the administration of the Shelby County Jail. As the Supreme Court noted in *Bell v. Wolfish*, the court's inquiry derives from the requirements of the Constitution and "judicial answers ... must reflect that fact rather than a court's idea of how best to operate a detention facility." 441 U.S. at 539, 99 S.Ct. at 1874.

Although the actions of government officials to correct problems at the jail were not at issue in the conditions phase of this trial, the court is aware through pretrial

---

15. This court shares the concern expressed by then Chief Justice Warren Burger in his dissent in *Bounds* about the source of the right of access and its requirement that state and local governments fund the means by which inmates exercise the right. 430 U.S. at 833–35, 97 S.Ct. at 1500–01 (Burger, C.J., dissenting). The requirements of *Bounds* have not been altered, however, and *Bounds* represents the law which this court must apply.

16. In fact, the court notes that a considerable number of inmates of the Shelby County Jail apparently are successful in filing lawsuits with this court.

17. Some proof pertinent only to the relief phase was presented at trial of the conditions phase. For example, the county mayor and Board of

Commissioners presented evidence concerning the sheriff's budget. While these defendants argue that this proof is relevant at the conditions phase, this court disagrees. While proof about a governmental entity's allocation of resources or its governmental objectives may on occasion be relevant with respect to liability for jail or prison conditions, *see Roberts*, 773 F.2d at 725; *Willis v. Barksdale*, 625 F.Supp. 411, 416–17 (W.D.Tenn.1985), the county's proof does not fall in this category. The evidence does not communicate any justification for any particular decision about expenditures of funds or jail policy; the proof is simply the amount of the sheriff's budget for various categories and his sources of revenue.

**690**

discussions with the parties that local and state government have undertaken a number of actions directed at remedying at least some of the conditions now determined by the court to be unconstitutional. Throughout the pendency of this proceeding the parties to this litigation have worked together in a spirit of good faith and cooperation. If the parties, continuing in that spirit, can negotiate a resolution of the relief issues, the result would be better for all the parties and the public than relief ordered by the court. The court therefore requests that the parties discuss the possibility of such a resolution on the relief issues.

Finally, the court will meet with the parties at 1:30 p.m. on Thursday, August 24, 1989, to discuss a schedule for further proceedings in this case.

IT IS SO ORDERED.